[No. B245657. Second Dist., Div. Eight. Dec. 21, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN RAMON MERAZ et al., Defendants and Appellants.

THE SUPREME COURT OF CALIFORNIA GRANTED REVIEW IN THIS MATTER
(see Cal. Rules of Court, rules 8.1105(e)(1)(B), 8.1115(e)) March 22, 2017, S239442.

1164

## Counsel

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Juan Ramon Meraz.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant Juan M. Chambasis.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Victor Bibiano.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FLIER, J.**—Codefendants Juan Ramon Meraz, Juan M. Chambasis, and Victor Bibiano separately appeal their convictions and sentences for murder, attempted murder, and discharging a firearm at an inhabited dwelling following a gang-related shooting that killed two victims and seriously injured a third. We previously affirmed the judgments with certain corrections to their sentences. Our high court granted review and transferred the case to us for reconsideration of defendants' confrontation clause challenges to the gang expert's testimony in light of *People v. Sanchez* (2016) 63 Cal.4th 665 [204 Cal.Rptr.3d 102, 374 P.3d 320] (*Sanchez*). In the published portion of this opinion, we conclude reversal is not warranted under *Sanchez*, so we once again affirm the judgments as modified.

### PROCEDURAL HISTORY

Appellants were jointly charged with the murders of Javier Zamora and Justin Curiel (Pen. Code, § 187, subd. (a); counts 1 & 2),[1] the attempted premeditated murder of Jose Santa Ana (§§ 187, subd. (a), 664; count 3), and discharging a firearm at an inhabited dwelling (§ 246; count 4). For the murder counts, multiple-murder and gang-murder special circumstances were alleged. (§ 190.2, subd. (a)(3), (22).) A variety of firearm and gang enhancements were also alleged.[2] A first trial ended in a mistrial after the jury deadlocked. On retrial, the jury found appellants guilty on all counts and found all special circumstances and enhancements true. At separate sentencing hearings, the trial court sentenced each appellant to life without the possibility of parole, a consecutive life sentence, and an additional 50 years to life in state prison as follows: life without the possibility of parole for count 1, plus 25 years to life pursuant to section 12022.53, subdivision (d); and a consecutive life sentence on count 3, plus 25 years to life pursuant to section 12022.53, subdivision (d). The court imposed concurrent sentences on counts 2 and 4 and stayed the remaining enhancements for counts 1 and 3.[3] The court imposed various fines, fees, and custody credits discussed further, *post*, as necessary. Appellants separately appealed.

### STATEMENT OF FACTS

The shooting in this case was part of a long-standing rivalry between two gangs in Pacoima: Pacoima Terra Bella (Terra Bella) and the Pacoima Project

---

[1] Undesignated statutory citations are to the Penal Code unless otherwise noted.

[2] It was alleged Chambasis had a prior strike conviction, which the trial court ultimately found not to be true.

[3] The court struck the firearm enhancements for count 4 on dual-use grounds.

Boys (Project Boys). The rivalry reached a heated point on May 5, 2008, when Project Boys member Jose Avila shot and killed Terra Bella member Alejandro Villa. Avila was convicted of the murder. The shooting by appellants here—all Terra Bella members—was viewed as retaliation for Villa's murder.

On September 20, 2009, the day of the shooting, 16-year-old Project Boys member Santa Ana lived at the San Fernando Gardens housing project, which was in Project Boys gang territory. Santa Ana and fellow Project Boys member Zamora were on the porch of Rosemary Hurtado's apartment when Curiel joined them. Curiel was not a gang member and had just moved into San Fernando Gardens. About five minutes after Curiel arrived, three males approached, carrying firearms. Santa Ana recognized them and identified them at trial as Bibiano, also known as "Blacky"; Meraz, also known as "Curley"; and Chambasis, also known as "Bash." Bibiano asked the trio where they were from, which Santa Ana knew was gang parlance asking which gang they were from. Curiel tried to say he "wasn't from anywhere." One of the appellants said they were from Terra Bella. Meraz told a group of young children playing nearby, including Curiel's brother, to leave. When the children left, appellants began shooting.

Before the shooting, 12-year-old S.B. was playing near the porch where the shooting took place. She noticed three males approaching the victims on the porch. One of the approaching males had a gun in his hand, and S.B. identified him at trial as Chambasis. As the shooting began, she grabbed her younger brother and carried him inside her house.

Zamora was shot seven times, and three of the shots were fatal. Curiel was shot four times, and two of the shots were fatal. Santa Ana was shot five times, and although he survived, he pretended like he was dead. After appellants fled back the way they had come, Santa Ana saw his friends were dead, so he tried to walk toward a nearby fire station but collapsed on the way.

Hurtado heard the gunshots, emerged from her apartment to investigate, and saw Santa Ana and the other two victims. As she checked on her children, Santa Ana walked away. When she found him heading toward the fire station, he repeatedly told her "Terra Bella" shot him.

Several Los Angeles police officers arrived at the scene. One officer approached Santa Ana and said to him, "You're going to die. Who shot you? What happened?" Santa Ana responded, "Blacky from Terra Bella Street," i.e., Bibiano, shot him. He told another officer "Blacky" had tattoos of a "1"

and a "3" on his forearms.[4] At the hospital, Santa Ana was shown a series of photographs and he identified all three appellants as the shooters.

Thirteen shell casings, eight bullets, and two partial bullets were recovered from the scene. A ballistics expert linked one of the casings to a gun used by Timothy Jenkins in a shooting eight days earlier. Jenkins was a member of the Pacoima Pirus gang, which had a friendly relationship with Terra Bella. He told police he traded the gun to Chambasis for marijuana on the day before the shooting at San Fernando Gardens.

All three appellants were arrested the day after the shooting. When officers contacted Meraz, he briefly attempted to flee but was apprehended. Officers recovered a cell phone and a belt buckle with the letter "T" on it. Chambasis and Bibiano were arrested when officers stopped the car they were riding in together. Bibiano gave officers a false name. A search of Chambasis's residence yielded two Pittsburgh Pirates baseball caps with "RIP, Bones" and "TBST" written on them, a rifle, a shotgun, and other items with his name on them.

While in custody, Bibiano and Meraz were placed in a cell together and their conversation was secretly recorded. Bibiano said he was going to "do life." He said officers got him in "Bash's car" about an hour before. He claimed he did not know anything because he "was not even there." Meraz also claimed he "wasn't even there" and said he did not know Bash. Bibiano responded, "Me neither." Bibiano said, "The rest of my life has gone to waste," to which Meraz responded, "All because of some stupid shit." Bibiano said Bash had told him, "Don't trip, dude," and Bibiano had responded, "I'm no fuckin' rat, man." Meraz commented, "If you rat, foo', they'll make paperwork on you," and "when you get to the big house, they fuck you up, foo'. Don't say anything." Bibiano said, "Yeah, I know. It doesn't matter ain't gonna happen. I don't even got nothing. Shit, I was not even there, man. What the fuck I'm gonna tell you?" Meraz claimed all the police had was "a bunch of gossip." Meraz said, "What saved me foo', is that they asked me what I was doing. And I told him that—that I was with Paula. And they called her and she said yes." Bibiano responded, "Hopefully my girl will also say yes." They talked about serving life in prison and Meraz said he had "lost everything . . . [a]ll because of one thing." Bibiano said, "We'll never get out, dude. Never." Bibiano said something about leaving the house and "I wasn't even gonna go out, foo'. I should've stayed, I should've stayed." Meraz agreed. When Bibiano said the police showed him a picture of Meraz, Meraz responded, "We should've worn masks. Stupid ass, Bash."

---

[4] When Bibiano was arrested the following day, he had tattoos matching Santa Ana's description, although by the time of trial he had turned the "1" into a "T" and the "3" into a "B."

During an interview about the murders, Bibiano began to cry. He denied knowing Chambasis.

At an interview with the police after appellants were arrested, Luis E. Orozco said Bibiano "jumped" him into the gang and Terra Bella had "problems" with Project Boys after Villa's murder. Orozco was with appellants at a park three to five miles away from the San Fernando Gardens at around 5:00 p.m. the day of the shooting. He let Bibiano borrow his cell phone and Bibiano left the park around 5:20 p.m. After Bibiano left the park, he called Orozco later at home and told him, "Don't go outside there's too much cops." At some point, Bibiano returned to say goodbye to his girlfriend and gave Orozco his phone back. Bibiano began to watch the news, which Orozco found suspicious. In response to a story showing "ladies crying" in "the Projects right here," Bibiano seemed nervous and said, "Man, fuck. I got to get the fuck out of here." He said he had "fucked up" and he was "going to hell." A recording of the news broadcast from that day showed photographs of Zamora and Curiel with signs reading "Rest in peace, Javier, Pimps" and "Rest in peace, Justin."

A search of the phone Orozco said he lent Bibiano and the phone recovered from Meraz revealed a text message was sent from Meraz's phone to Orozco's phone at 1:17 p.m. the day after the shooting reading, "I'm going to Sinaloa tonight. I already got my ticket." At 1:27 p.m., Orozco's phone responded, "Can I go with you, or what[?]" At 7:05 p.m. on the day of the shooting, Meraz's phone sent a text message to a different number reading, "On the run."

Officer Tyler Adams testified as a gang expert for the prosecution. He was assigned to monitor Terra Bella and he gathered information by talking to gang members, both in and out of custody, as well as interviewing them as part of conducting probation and parole services. Terra Bella had approximately 30 members and their symbols included "13" to signify affiliation with the Mexican Mafia and the hand signals and initials "TB" and "TBS." The gang's primary activities were burglary, grand theft, carrying loaded and concealed firearms, assault with firearms, assault likely to cause great bodily injury, and felony vandalism. Officer Adams identified convictions of several Terra Bella gang members for those types of crimes. He confirmed the rivalry between Terra Bella and Project Boys, which became heated after Avila murdered Villa in May 2008.

Officer Adams confirmed all three appellants were Terra Bella gang members. Meraz had previously admitted he was a Terra Bella gang member, and when Officer Adams had previously stopped him, he had been with other gang members, had been wearing gang attire, and had "PTB" tattooed inside

his bottom lip. During one stop, Meraz said he was trying to get into Terra Bella and had to "smoke somebody" to do so. Bibiano had gang tattoos and when Officer Adams previously stopped him, he had been with other gang members. Officer Adams had also obtained a photograph showing Bibiano throwing gang hand signals. Chambasis also had gang tattoos and Officer Adams had previously stopped him in the presence of other Terra Bella gang members. Since his arrest, Chambasis had added tattoos to his face and neck.

Officer Adams testified to the importance of respect in a gang and "putting in work" by typically committing crimes to move up in the gang. He believed the shooting in this case was bold within Terra Bella, given it occurred during the day in rival gang territory. When given a hypothetical question tracking the facts of the shooting, Officer Adams opined the shooting was retaliatory for Villa's murder. He also opined the murders were associated with, committed for, and likely committed at the direction of Terra Bella.

Appellants did not testify. In his defense, Chambasis offered evidence that no fingerprint analysis was done on the casings recovered at the scene of the shooting. He elicited testimony that when police interviewed S.B. at the police station after the shooting, she said the gunman she remembered was shorter than the officer interviewing her, who was about five feet 10 inches tall, and had hair. She said the other men did not have guns. When she was shown two books of photographs, she pointed to someone who was not Chambasis and said, "Kind of No. 11 . . . but only had hair." Chambasis also elicited testimony that at the scene of the shooting and later in the hospital, Santa Ana claimed he did not know one of the assailants. In his defense, Bibiano elicited testimony that Santa Ana initially said at the scene of the shooting that he did not know from which direction the gunmen had come. He also said appellants all wore black and Meraz was the one who said, "Where you vatos from." He did not see them in a car.

## DISCUSSION

1. *Santa Ana Impeachment Evidence*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Gang Expert Testimony*

Appellants jointly contend the trial court violated their Sixth Amendment rights to confrontation by allowing Officer Adams to give expert opinions based on out-of-court testimonial hearsay from declarants whom appellants

---

[*]See footnote, *ante*, page 1162.

did not have an opportunity to cross-examine. Before our high court decided *Sanchez*, we found no error. Reevaluating appellants' contentions in light of *Sanchez*, we conclude a narrow portion of Officer Adams's testimony was barred by the confrontation clause and state law, but the erroneous admission of that testimony was harmless beyond a reasonable doubt.[7]

## A. *Sanchez*

In *Sanchez*, our high court considered the extent to which *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*) limits an expert witness from relating case-specific hearsay in explaining the basis for an opinion, and it clarified the application of state hearsay rules to that kind of expert testimony. It held the case-specific out-of-court statements conveyed by the prosecution's gang expert constituted inadmissible hearsay under state law and, to the extent they were testimonial, ran afoul of *Crawford*. (*Sanchez, supra*, 63 Cal.4th at pp. 670–671.)

As is typical in gang-related prosecutions, the gang expert in *Sanchez* testified to his background and experience "investigating gang-related crime; interacting with gang members, as well as their relatives; and talking to other community members who may have information about gangs and their impact on the areas where they operate. As part of his duties, [he] read reports about gang investigations; reviewed court records relating to gang prosecutions; read jail letters; and became acquainted with gang symbols, colors, and art work." (*Sanchez, supra*, 63 Cal.4th at p. 671.) He also testified about the gang to which the defendant allegedly belonged, including its primary activities and the convictions of two gang members demonstrating the gang's pattern of criminal activity. (*Id.* at p. 672.) As to the defendant specifically, the expert testified about five contacts defendant had with police reflected in a STEP[8] notice, police reports, and a field identification (FI) card. The expert was not present during any of the contacts and only related the information recorded by other officers. Based on this information, the expert opined the defendant was a gang member. (*Id.* at p. 673.)

The defendant challenged the admission of the gang expert's testimony describing the defendant's prior contacts with police, arguing it was testimonial hearsay that violated his confrontation clause rights. (*Sanchez, supra*, 63

---

[7] Respondent argues appellants forfeited this issue by failing to object on confrontation clause grounds in the trial court. Any objection would likely have been futile because the trial court was bound to follow pre-*Sanchez* decisions holding expert "basis" evidence does not violate the confrontation clause. (See, e.g., *People v. Hill* (2011) 191 Cal.App.4th 1104, 1128–1131 [120 Cal.Rptr.3d 251].) We will therefore address the merits of this claim.

[8] This acronym is a reference to the California Street Terrorism Enforcement and Prevention Act. (Pen. Code, § 186.20 et seq.; *Sanchez, supra*, 63 Cal.4th at p. 672, fn. 3.)

Cal.4th at p. 674.) The defendant did *not* challenge the admission of the background testimony from the expert, such as his description of "general gang behavior or descriptions of the . . . gang's conduct and its territory." (*Id.* at p. 698.)

■ As the court explained, under *Crawford* and the confrontation clause, a hearsay statement is inadmissible unless it falls within an exception recognized at the time of the Sixth Amendment's adoption or the declarant is unavailable to testify and the defendant had a previous opportunity for cross-examination or that opportunity was forfeited. (*Sanchez, supra*, 63 Cal.4th at p. 680.) Thus, a court's task in evaluating out-of-court statements under hearsay rules and *Crawford* is two-fold: "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez, supra*, at p. 680.)

■ On the state law question, the court drew a line between an expert's testimony as to general background information and case-specific facts. Traditionally, "an expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds," but experts have not been permitted to convey case-specific hearsay about which the expert has no personal knowledge. (*Sanchez, supra*, 63 Cal.4th at p. 676.) The court defined case-specific facts as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) An expert may "testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge." (*Ibid.*) The court gave several examples of this distinction, one of which pertained directly to gang experts: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Id.* at p. 677.)

The court explained that courts frequently avoided any confrontation clause issues with this kind of expert basis evidence by "concluding that statements

related by experts are not hearsay because they 'go only to the basis of [the expert's] opinion and should not be considered for their truth.' " (*Sanchez,* *supra,* 63 Cal.4th at pp. 680–681.) The court disapproved this reasoning when the expert bases an opinion on case-specific facts about which he or she has no personal knowledge: "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.) Because this testimony is hearsay, it implicates *Crawford* and the confrontation clause if the statements are also testimonial and none of *Crawford*'s exceptions apply. (*Sanchez,* at p. 685.)

 The court thus crafted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez,* *supra,* 63 Cal.4th at p. 686, fn. omitted.) Canvassing confrontation clause cases, it concluded hearsay statements are testimonial if they are made "primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Id.* at p. 689.)

Turning to the facts of the case, the court concluded the police reports, the STEP notice, and potentially the FI card were case-specific testimonial hearsay, violating the confrontation clause. First, the three contacts with the defendant reflected in police reports compiled by the investigating officers during the investigations of those crimes were "statements about a completed crime, made to an investigating officer by a nontestifying witness," which "are generally testimonial unless they are made in the context of an ongoing emergency . . . or for some primary purpose other than preserving facts for use at trial." (*Sanchez,* *supra,* 63 Cal.4th at p. 694.) It did not matter that the officers summarized the statements or that the defendant himself was not accused of the crimes. (*Id.* at pp. 694–695.) Second, the sworn STEP notice retained by police recording the defendant's biographical and other information was testimonial because it was a formal sworn statement from a police officer that the information was accurate, and its primary purpose was to

collect information for later use at trial. (*Sanchez*, at p. 696.) Finally, the FI card memorializing the contact with the defendant could be testimonial, but the court did not decide the issue because the expert's testimony was unclear and confusing on this point. It noted "[i]f the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Id.* at p. 697.)

The court found the confrontation clause violation prejudicial as to the gang enhancements because the main evidence of the defendant's intent to benefit the gang was the expert's recitation of testimonial hearsay. (*Sanchez, supra*, 63 Cal.4th at p. 699.) In doing so, it took care to note the defendant was not challenging the expert's "background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory," which was "based on well-recognized sources in [the expert's] area of expertise. It was relevant and admissible evidence as to the . . . gang's history and general operations." (*Id.* at p. 698.)

## B. *Officer Adams's Testimony*

Like the expert in *Sanchez*, Officer Adams testified to his extensive training on gangs generally and how he gathered background information about Terra Bella. For training, he had attended gang courses and conferences; he had trained in the field with an officer who pointed out active gang members; he had responded to gang-related crimes; and he had spoken with gang officers and detectives. He had also been assigned to a gang crime-prevention task force responding to hot spots around Los Angeles, during which he would speak to gang officers and detectives about the gangs involved. As part of the gang unit in the Foothill Division monitoring Terra Bella, he had gathered intelligence on gang membership and rivalries to allow him "to respond more effectively in response to a shooting or any other gang-related crimes." He received the "majority of our intelligence" by "speak[ing] with gang members of all levels and ages, both in and out of custody, whether they're suspects, victims, witnesses, or none of the above. We conduct probation and parole services, at which time we would interview them about just general gang life."

Based on this experience and background, he described the size of Terra Bella, its symbols, and its primary activities, and he identified the convictions of several Terra Bella members based on court records. He also described the rivalry between Terra Bella and Project Boys, which became heated after Avila murdered Villa in May 2008. He further testified to the importance of respect in a gang and "putting in work" by typically committing crimes to move up in the gang, and he believed the shooting in this case was bold because it occurred during the day in rival gang territory. When given a

hypothetical question tracking the facts of the shooting, Officer Adams opined the shooting was retaliatory for Villa's murder and was committed in association with, for, and at the direction of Terra Bella.

As to appellants specifically, he opined all three appellants were Terra Bella gang members. Critically and in contrast to *Sanchez*, he based his opinion on his personal interactions with each of them, which were recorded on FI cards intended to "document the basics of the stop for any future investigative use." For example, Officer Adams stopped Meraz two months before the shooting in this case, and Meraz told him he was trying to become a full-fledged member of Terra Bella, and to do so, he needed to "smoke" someone. Officer Adams interpreted this to mean he needed to shoot someone. Meraz also wore Terra Bella gang attire during this encounter and had a Terra Bella gang tattoo inside his bottom lip. Officer Adams contacted Bibiano several times while in the company of other Terra Bella gang members. He identified Bibiano in photographs in which he was displaying gang hand signals and gang tattoos. And Officer Adams contacted Chambasis twice in the presence of other gang members. He took photographs of Chambasis's gang tattoos and belt buckle.

Officer Adams did, however, also testify regarding FI cards filled out by other officers. In one, Meraz said he was a member of the Pierce Street gang, not Terra Bella. In another, it was noted Meraz was present with another gang member. In a third, it was noted Meraz was with a "gang member associate." Officer Adams also testified about an arrest report from other officers related to another gang member indicating Meraz was with him when the gang member was arrested.

### C. *Analysis*

Appellants argue almost all aspects of Officer Adams's general background testimony were case specific and testimonial, including his opinion that the shooting in this case was in retaliation for Villa's murder, how Terra Bella operates, the gang's primary activities, and the gang's pattern of criminal activity based on convictions of other gang members. In doing so, appellants attack the *sources* of Officer Adams's testimony, namely "out-of-court statements made by both police officers and other gang members." They also focus on how the prosecution used Officer Adams's testimony to prove both the gang enhancements and the retaliatory motive for the shooting in this case. Appellants fundamentally misunderstand the scope and import of *Sanchez*.

■ Under *Sanchez*, facts are only case specific when they relate "*to the particular events and participants* alleged to have been involved in the case

being tried," which in *Sanchez* were the defendant's personal contacts with police reflected in the hearsay police reports, STEP notice, and FI card. (*Sanchez, supra*, 63 Cal.4th at p. 676, italics added.) The court made clear that an expert may still rely on general "background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory," which is relevant to the "gang's history and general operations." (*Id.* at p. 698.) This plainly includes the general background testimony Officer Adams gave about Terra Bella's operations, primary activities, and pattern of criminal activities, which was unrelated to defendants or the current shooting and mirrored the background testimony the expert gave in *Sanchez*. It also falls in line with the *Sanchez* court's hypothetical example that an expert may testify that a diamond tattoo is "a symbol adopted by a given street gang" and the presence of the tattoo signifies the person belongs to the gang. (*Id.* at p. 677.) By permitting this type of background testimony, the court recognized it may technically be based on hearsay, but an expert may nonetheless rely on it and convey it to the jury in general terms. (*Id.* at p. 685.) Thus, under state law after *Sanchez*, Officer Adams was permitted to testify to non-case-specific general background information about Terra Bella, its rivalry with Project Boys, its primary activities, and its pattern of criminal activity, even if it was based on hearsay sources like gang members and gang officers.[9]

We also conclude that none of this background information was testimonial. Unlike the STEP notice, police reports, and FI card in *Sanchez*, nothing in the record suggests Officer Adams obtained any of this information "primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony." (*Sanchez, supra*, 63 Cal.4th at p. 689.) Officer Adams described the sources of his background information on Terra Bella and the rivalry with Project Boys in only the most general terms. He conveyed no specific statements by anyone with whom he spoke, and reached only general conclusions based on his education, training, and experience. As we explained in a case before *Sanchez*, "[d]ay in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some unspecified criminal prosecution." (*People v. Valadez* (2013) 220 Cal.App.4th 16, 36 [162 Cal.Rptr.3d 722].) To conclude otherwise would eviscerate the role of gang

---

[9] Even if we assume Officer Adams's opinion that the shooting was retaliatory for Villa's murder by the rival Project Boys gang was case specific and beyond his personal knowledge, his opinion was still admissible. Another gang officer who assisted in the investigation of the Villa murder testified to the feud between Terra Bella and Project Boys. Officer Adams was permitted to rely on those independently proven facts to opine the current shooting was retaliatory for Villa's murder. (See *Sanchez, supra*, 63 Cal.4th at p. 686 [expert cannot rely on case-specific hearsay unless it is "independently proven by competent evidence"].)

experts in gang-related prosecutions, a consequence the court in *Sanchez* neither contemplated nor likely intended.[10]

Some portions of Officer Adams's testimony were case specific under *Sanchez*, namely, his interactions with appellants memorialized on FI cards. But unlike the hearsay documents in *Sanchez*, this testimony was not barred under state or federal law because Officer Adams was present during these contacts, had personal knowledge of the facts, and was subject to cross-examination at trial. (*Sanchez, supra*, 63 Cal.4th at pp. 676, 680.)

Respondent concedes, and we agree, state hearsay rules barred the admission of Officer Adams's testimony on the FI cards and arrest report completed by *other* officers outside his presence, all of which conveyed the same type of case-specific information the court barred in *Sanchez*. Respondent also concedes, and we also agree, the arrest report was testimonial because it was most likely made during an investigation of a completed crime, like the police reports in *Sanchez*. Respondent disagrees, however, that the FI cards were testimonial because they were "not produced in the course of an ongoing criminal investigation, but rather were produced as investigative tools to help police solve crimes that may not have even occurred at the time F.I. card was produced." Yet, Officer Adams testified FI cards are created "to document the basics of the stop for any future *investigative use*." (Italics added.) Although the court in *Sanchez* did not decide whether the FI card at issue there was testimonial, it noted the FI card might be if it "was produced in the course of an ongoing criminal investigation." (*Sanchez, supra*, 63 Cal.4th at p. 697.) It seems the FI cards here fall close to that line.

In any case, we will assume the FI cards at issue here were testimonial because we conclude their admission and the admission of the arrest report was harmless beyond a reasonable doubt. (*Sanchez, supra*, 63 Cal.4th at p. 698 [applying federal harmless error standard to confrontation clause violation].) The FI cards and arrest report purported to show Meraz's membership in Terra Bella, which could be relevant to the retaliatory motive and gang enhancements in this case. (*Id.* at pp. 698–699 [noting gang membership was not element of gang enhancement but could be relevant to intent to benefit gang element].) But the evidence was duplicative of and weak compared to the other evidence that overwhelmingly demonstrated his Terra Bella membership. He admitted his gang affiliation to Officer Adams, explaining he was trying to become a full-fledged member of Terra Bella, and to do so, he needed to "smoke" (i.e., shoot) someone. And he wore Terra Bella gang attire

---

[10] The certified records of the convictions of other gang members also were not testimonial under *Crawford*. (*People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 [29 Cal.Rptr.3d 203] [documents showing "acts and events relating to convictions and imprisonments" are not testimonial under the confrontation clause].)

and had a Terra Bella gang tattoo inside his bottom lip. To the extent the FI cards and arrest report tended to show Meraz harbored a gang retaliation motive for the shooting, the evidence of retaliation was already overwhelming. Meraz committed the shooting with fellow gang members Bibiano and Chambasis in the heart of Project Boys territory, the gang responsible for Terra Bella gang member Villa's murder. And just before the shooting Bibiano asked the victims where they were from, which everyone understood to be a gang challenge. On this record, any state or federal error in admitting the FI cards and arrest report was harmless beyond a reasonable doubt.

3.–7.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

We modify each appellant's judgment to strike the section 186.22, subdivision (b)(1) enhancement, to strike the section 1202.45 parole revocation fine, to impose a $160 court security fee, and to impose a $120 criminal conviction assessment. We further modify Chambasis's abstract of judgment to reflect 1,173 days of presentence custody credits, modify Meraz's abstract of judgment to reflect 1,166 days of presentence custody credit, and modify Bibiano's abstract of judgment to reflect 1,167 days of presentence custody credit. The trial court is directed to forward the corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

We affirm the judgments as modified.

Rubin, Acting P. J., and Grimes, J., concurred.

Appellants' petitions for review by the Supreme Court were granted March 22, 2017, S239442.

---

*See footnote, *ante*, page 1162.