Filed 1/19/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H042184 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1360508) |
| v. | |
| MICHAEL HUYNH, | |
| Defendant and Appellant. | |

Defendant Michael Huynh was sentenced to prison after a jury found him guilty of assault with a deadly weapon and other offenses, with gang enhancements. On appeal, he asserts prejudicial discovery violations, error concerning the prosecution's gang expert testimony, and insufficient evidence to support the conviction and gang enhancement for unlawful possession of a billy. For the reasons explained here, defendant has failed to establish prejudicial discovery or evidentiary error, and the conviction for possession of a billy and related gang enhancement are supported by substantial evidence. We will affirm the judgment.

## I.     BACKGROUND

In March 2012, defendant, then a student at Andrew Hill High School in San Jose, was involved in a fight with another student. Fourteen months later, defendant retaliated against Julian, the student whom he perceived had "jumped" him. On May 8, 2013, defendant, along with four or five other males, chased Julian and two schoolmates, Isaiah

and Alvaro, as they were returning to the school campus after lunch, and accosted Julian on Senter Road in front of the school.[1]

San Jose Police Officer Paul Guerra interviewed Julian, Isaiah, and Alvaro after the incident. Julian told Officer Guerra that one of the males had hit the back of his head with a blunt object, and another male had raised a hammer as if to hit him, but Julian ran. Julian did not have any visible injuries or identify his assailant. Alvaro told Officer Guerra someone said " 'What's up, cuz,' "and " 'There he is. Get him,' " and that he saw an Asian male strike Julian in the back of the head with a hammer. Isaiah said that Julian was the target of the attack and was struck in the back of the head with a "short handled sledgehammer." Isaiah also reported that other members of the group had weapons, including a meat hanger and a short metal baseball-type bat. Isaiah looked through photographs of former students with the school's liaison probation officer, Colleen Thomas, and he identified defendant as the male who, pointing to Julian, said to a male with a hammer, " 'That's him, Get him.' "

Officers executed a search warrant at defendant's residence about two months later. In addition to seizing defendant's cellphone and gang paraphernalia, they seized a pair of metal knuckles, a loaded firearm, and ammunition from a bedroom defendant shared with his brother. They also seized a small sledgehammer and collapsible baton from a Toyota Corolla parked in the driveway.

Defendant was arrested and interviewed by Detective Jill Ferrante. He said the brass knuckles, the drawer where the gun was found, and the Toyota were his, but he knew nothing about the baton, the hammer, or the gun. He said he had been jumped at school in March 2012 and that he "went after [Julian] in retaliation" in May. He admitted chasing Julian across the street and swinging a crowbar at him, but denied striking him.

---

[1] We use given names to protect the identities of the witnesses who were minors in 2013.

2

## II.    TRIAL COURT PROCEEDINGS

Defendant was charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count 1 [undesignated statutory references are to the Penal Code]), unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), unlawful possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3), possession of metal knuckles (§ 21810; count 4), and two counts of possession of "a weapon of the kind commonly known as a billy" (§ 22210; count 5 [the collapsible baton] and count 6 [the mini sledgehammer]).  The information alleged that counts 1, 5, and 6 were committed to promote, further, or assist a criminal street gang (§ 186.22, subd. (b)(1)), and that defendant had sustained a prior conviction for residential burglary subjecting him to additional punishment under the Three Strikes law (§§ 667, subds. (b)–(i) and 1170.12) and section 667.5, subdivision (a).

At trial, Julian, Isaiah, and Alvaro were called as witnesses for the prosecution.  Julian's testimony was more detailed than the statement he had given Officer Guerra.  He testified that a group of five or six Asian males, including defendant, approached him and his schoolmates as they were walking across Senter Road.  One of the males said "What's up, Cuz?" and Julian realized "they were coming at me, at us," and then "[e]verything happened."  Within seconds Julian was hit on the back of his head with what felt like a blunt object.  He turned around and saw "[a]ll the guys that were trying to get me."  Defendant, whom Julian recognized as a former student, was very close, about a foot away, with "like a crowbar," a "metal blunt object" in his hands, positioned at an angle as if following through with a swing.  Before he could react, someone else struck his cheek area with "[l]ike a construction hammer" with a "metal end."  The males all had weapons, including knives, and one of them yelled "Asian Boyz" as Julian ran back to school.  Julian was not injured, but he applied ice for the pain, and he told Officer Guerra that the Asian Boyz did this.  Julian had seen defendant in a fight on the school campus in

3

2012.  It was a one-on-one fight in the bathroom, but Julian left before it ended and did not know who won.

On cross-examination, Julian acknowledged testifying at the preliminary hearing to being struck on the back of his head, but not about a strike to his cheek, and he did not remember also testifying that he had been hit with bare hands.  He did not have a clear recollection of his interview with Officer Guerra, and he could not remember whether he had told Officer Guerra that someone had shouted "Asian Boyz," but he had told Officer Guerra he had been hit by a hammer.

Alvaro testified that he, Julian, and Isaiah were "rushed," "really fast," as they crossed the street by a group of about five people, one of whom said something like " 'What's up' " or " 'What's up, cuz.' "  Alvaro ran "because there was more than one person attacking Julian."  He did not remember seeing Julian get struck, and if he had told Officer Guerra he had seen Julian get hit by a hammer in the back of the head, that was because he was repeating what Julian had told him after the attack.

Isaiah testified that he, Alvaro, and Julian were crossing the street when he noticed a commotion in the median that he knew "wasn't good" and "looked rough," so he ran. He saw fast, sudden, movement, his instinct told him it was dangerous, and he felt fear. He saw a group of people surround Julian, but he and Alvaro were not hit.  He had no recollection of what happened, his memory was not refreshed by the statement he had given Officer Guerra, and he did not remember speaking with probation officer Thomas. The court made a finding under *People v. Green* (1971) 3 Cal.3d 981 that Isaiah was being deliberately evasive, and his prior statements were admitted for their truth under Evidence Code sections 1235 and 1237.

Officer Guerra related the statements made by Julian, Alvaro, and Isaiah after the attack.  He also testified that none of the students had reported hearing someone yell "Asian Boyz;" Julian never told him he had been hit in the face or hit with a hammer; Julian did not name his assailant that day; and there were no visible signs of injury.

4

Probation officer Thomas testified that Isaiah had identified defendant among photographs of former students, and that while defendant was a student at Andrew Hill High School he would spend time in an area on the main quad where Asian Boys gang members congregated.

Chris Hardin, an expert in digital forensics employed by the Santa Clara County District Attorney's Crime Lab, testified regarding data extracted from defendant's cell phone, including two Facebook chat messages. In a May 16, 2013 chat between defendant (using the handle "Vietnamese Cuhz") and a Sons of Samoa gang member who was upset with defendant for going after Isaiah, defendant wrote, "it's called retaliation," and "dnt be asking me about your lil homie, like I said I went after the fat nigguh, if you boy got in the way than it woulda been bad, if your boy got a problem than he can handle it with the homie." Defendant continued: "I told you many times, he didn't get touch n we weren't after him, get it straight. [H]e clearly seen us going after the nigguhs from trees." Defendant also messaged, "I already told you, we aiming for julian," and "I told you I was after julian. Your homie ran when I chased julian." In a Facebook chat with a female in April 2013, the female wrote "Are you serious … David told me it's because of your car and the hammer." Defendant responded, "Hammer is a weapon. Not supposed to have weapons on me."

Officer John Vanderbroeck testified regarding the search of defendant's residence, and several photographs of seized items were introduced through him. Detective Ferrante testified that after his arrest, defendant told her he had been jumped at school in March 2012, he believed his attacker was Julian, he had retaliated on May 8 for that attack, and he had chased Julian across the street and swung a crowbar at him but did not strike him.

Detective Ferrante also testified as an expert in gang culture, and in identifying gangs and gang members in San Jose. She was a 19-year veteran with the San Jose Police Department, and her first contact with the Asian Boyz gang occurred within the

5

first eight years of her career.  The Asian Boyz is an informally structured gang that associates with the African-American Crips gang.  It identifies with the color blue, letters "ABZ," and corresponding numbers "1-2-26."  Gang culture is based on respect, and respect is maintained by instilling fear through violence and retaliation.  Consistent with that culture, Asian Boyz gang members promote themselves as dangerous and respected.

Detective Ferrante joined the gang investigations unit in May 2013 (about 18 months before trial), and had been briefed by the police department's veteran Asian gang expert at that time.  That detective "solidified absolutely everything that I had already thought. . . . [H]e showed me pictures of what they are wearing, what they look like, and I've seen them before.  Obviously, being on the street for 12 years, you get to run into them every now and then."

Detective Ferrante reviewed weapons-related criminal convictions by Asian Boyz gang members, and law enforcement documents relating that defendant had bragged about his affiliation with that gang.  She opined that in 2013 Asian Boyz was an ongoing criminal organization with at least three members; that the gang's main criminal activities were assault with a deadly weapon, battery, possession of guns, and drug dealing; that defendant was a member of the Asian Boyz; and the assault against Julian was retaliation which benefitted the gang.  She also opined that defendant possessed the mini sledgehammer and the collapsible baton for the benefit of the gang.

At the close of evidence, the court entered an acquittal on the gang enhancement for count 5 (the collapsible baton).  The jury convicted defendant of all counts and found true the remaining gang enhancements.  Defendant admitted his prior conviction, and was sentenced to ten years four months imprisonment.[2]

---

[2] The court struck the punishment for the gang enhancements; imposed a low term of 4 years on count 1; concurrent 32-month sentences on counts 2, 3, 4, and 5; a consecutive 16-month sentence on count 6 (one-third the midterm); and a consecutive 5-year sentence for the serious felony enhancement.

## III.    DISCUSSION

### A. DISCOVERY ISSUES

Defendant argues that the trial court abused its discretion by finding no statutory discovery violations related to the prosecution's disclosure of a cellphone report containing data extracted from defendant's cellphone, the name of the analyst who extracted the data, and Detective Ferrante's gang summary. He argues admission of that evidence resulted in an unfair trial. We review a trial court's ruling regarding discovery matters under an abuse of discretion standard. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) An abuse of discretion occurs when the trial court misapplies the law. (*Hernandez v. Amcord, Inc*. (2013) 215 Cal.App.4th 659, 680.)

### 1.  Background

In August 2013, defendant was arraigned on an amended complaint and waived his right to a preliminary hearing within 60 days after arraignment. The preliminary hearing was held on August 1, 2014, and the case was placed on the September 22, 2014 master trial calendar. The matter was reset for the following week, and trial commenced on Tuesday, October 7.

#### a.  Jail records

The prosecution issued a subpoena duces tecum for defendant's jail records on September 5, 2014. Defendant's motion to quash the subpoena was denied on September 24, and the records were released to the prosecution for copying. Detective Ferrante obtained a search warrant for a forensic examination of defendant's cellphone on September 23, and defendant received copies of the subpoenaed jail records and search warrant on September 30.

On October 7, defendant moved to compel production of outstanding discovery (including Detective Ferrante's gang summary), to exclude hearsay statements contained in the subpoenaed jail records, and to exclude any evidence produced as a result of the

7

September 23 search warrant because that evidence had not been received at least 30 days before trial. The court ruled that the hearsay statements contained in the subpoenaed jail records were admissible as a basis for Detective Ferrante's opinion that defendant was a gang member. Defendant received Detective Ferrante's gang summary that day, and his objection to two hearsay statements contained in that report was sustained.

### b. Cellphone report

When the court adjourned on Thursday October 9, the court instructed the prosecutor to contact the crime lab and impress that the cellphone report needed to be finalized that day out of basic fairness to defendant, given the stage of the proceeding (the hardship portion of jury selection had concluded). The parties received the report the next day, which included call logs and extracted texts messages, Facebook chat messages, photographs, songs, and videos.

When the court reconvened the following Tuesday, October 14, defendant objected to the cellphone report because it had not been disclosed 30 days before trial and no good cause had been established for the late disclosure. The court found no discovery violation because the report had been disclosed upon receipt. The court ruled that Detective Ferrante could refer to relying on the report in forming her opinion, and asked the prosecutor to quickly identify which extracted files he intended to present to the jury.

The next morning the prosecutor identified certain songs, texts, and Facebook messages he intended to present to the jury, and defendant moved to exclude those items based on a discovery violation and a violation of his due process right to a fair trial. The court maintained its view that no statutory discovery violation had occurred, but it expressed concern with potential prejudice resulting to defendant from the timing of the disclosure. It limited the prosecution to three songs and two redacted Facebook conversations. And given the volume of data extracted from the phone (including 96 Facebook chats, over 16,000 text messages, and 464 audio files), the court precluded the prosecution, which was starting its case-in-chief the next day, from presenting any

cellphone evidence until the following week.  With that much material, the court understandably stressed that it wanted to be accommodating, it would be in recess that Friday, and defendant could have additional time Monday morning to prepare if a request was made before Thursday's adjournment.

### 2. Analysis

The prosecution has a duty to disclose certain categories of evidence "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies," including "[a]ll relevant real evidence seized or obtained as part of the investigation of the offenses charged," and "[witness statements] or reports of the statements of witnesses whom the prosecutor intends to call at the trial, … reports or statements of experts made in conjunction with the case, [and] the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."  (§ 1054.1 & subds. (c), (f).)

Section 1054.7 requires that discovery disclosures be made at least 30 days before trial unless good cause is shown why a disclosure should be denied, restricted, or deferred.  If a party knows of or comes into the possession of material or information within that 30-day period, disclosure shall be made immediately unless good cause is shown.  (*Ibid.*)  Under section 1054.5, subdivision (b), the court may remedy a disclosure violation by delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuing the matter, or initiating contempt proceedings.

### a. Cellphone content

Defendant argues that disclosure of the cellphone report in the midst of jury selection violated section 1054.1 because the prosecution had been in possession and control of the phone, and by extension the extracted data, since the phone was seized in July 2013, and it failed to show good cause for disclosing the data within 30 days before

9

trial.  The cell phone, which falls under section 1054.1 subdivision (c) as real evidence seized as part of the investigation, came into the San Jose Police Department's possession when it was seized in July 2013.  Whether for purposes of section 1054.1 the data on the phone was in the possession of the prosecution or investigating agency before it was extracted is a legal question subject to our independent review on appeal.  (*People v. Groat* (1993) 19 Cal.App.4th 1228, 1231.)

Here, the investigating agency took possession of the cellphone in July 2013, the prosecution was aware that the phone contained potentially relevant information, it intended to extract that information, and the District Attorney's crime lab had the ability to perform the extraction.  Because that data was readily extractable (after obtaining a search warrant), in our view it was in the constructive possession of the prosecuting agency and it should have been disclosed at least 30 days before trial under section 1054.7.  The purpose of the statute is to "promote the ascertainment of truth in trials by requiring timely pretrial discovery."  (§ 1054, subd. (a).)  That intent would be thwarted if the prosecution could avoid the 30-day deadline by generating a late report.

But that does not end our inquiry because defendant has not demonstrated prejudice.  Even if the trial court erred by concluding that disclosure of the cellphone report was not a statutory violation, defendant has failed to show that the court would have remedied the late disclosure any differently had it been viewed as a statutory violation.  Section 1054.5 addresses remedies for a statutory disclosure violation.  The trial court has discretion under section 1054.5, subdivision (b) to "make any order necessary to enforce the [statutory disclosure] provisions," including immediate disclosure, delaying or prohibiting the testimony of a witness or the presentation of real evidence.  The court may prohibit a witness from testifying only if all other sanctions have been exhausted.  (*Id.*, subd. (c).)  "[E]xclusion of testimony is not an appropriate remedy absent a showing of significant prejudice and willful conduct motivated by a desire to obtain a tactical advantage at trial."  (*People v. Jordan* (2003)

10

108 Cal.App.4th 349, 358.) To address prejudice, courts should craft a remedy to "resolve or significantly resolve the disadvantage," including delaying the presentation of testimony to allow the surprised party the opportunity to prepare. (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1757.) Excluding testimony is called for only when prejudice is substantial and irremediable, and when it would not undermine the reliability of the truth-finding process. (*Id.* at pp. 1757–1758.)

The trial court, mindful of the potential prejudice to defendant resulting from the late disclosure of the cellphone report, crafted a remedy equivalent to any remedy available under the statute. The court required the prosecution to identify the files it intended to use at trial, admitted only two Facebook chats in redacted form, and allowed Detective Ferrante to rely on (but not play) three songs. Excluding that evidence would not have been warranted as a statutory remedy because defendant never claimed the prosecution was acting willfully or in bad faith to obtain a tactical advantage. The court prohibited the prosecution from presenting any cellphone evidence until the following week to ensure defendant had a reasonable opportunity to review the materials, and it offered defendant additional preparation time if needed.

Defendant has not shown that the court's remedy resulted in fundamental unfairness. (*People v. Partida* (2005) 37 Cal.4th 428, 436 [state law error rendering trial fundamentally unfair constitutes due process violation].) We acknowledge the lost opportunity to voir dire potential jurors about their reaction to use of the word "nigguh" in one of the Facebook chats. But defendant has not identified "lines of independent investigation, defenses, or trial strategies [he] otherwise would have pursued" with additional preparation time. (*In re Brown* (1998) 17 Cal.4th 873, 887.) Indeed, the inculpatory evidence was extracted largely from defendant's own Facebook files, and his access to that content was not prevented by law enforcement's seizure of his cellphone. As for the potentially inflammatory Facebook chat, on direct examination Detective Ferrante explained that no racial derogatory meaning attaches to using the word "nigguh"

11

in Crip-affiliated gang culture; she opined that its use would be akin to calling someone " 'brother' in Hawaii." The transcript of the Facebook chat, admitted in evidence, bore that out. The word was used casually to refer to Julian, Isaiah, and defendant.

### b. Remaining disclosure issues forfeited

Defendant has forfeited his arguments related to the late disclosure of the cellphone examiner as a witness, as he did not object to the prosecution adding Chris Hardin to its witness list on October 14. Nor has defendant preserved any error related to the disclosure of Detective Ferrrante's gang summary. In his October 7 motion in limine addressing discovery matters, defendant asked that the gang summary be turned over immediately. He received the report that day, and he never asked that Detective Ferrante's testimony be limited based on the timing of that disclosure.

## B. TESTIMONY FROM GANG EXPERT

### 1. Legal Backdrop and Standards of Review

Penal Code section 186.22 provides a sentencing enhancement for persons committing felonies "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) A criminal street gang is defined as any "ongoing organization, association, or group of three or more persons" that shares a common name or common identifying symbol; that has as one of its "primary activities" the commission of certain enumerated offenses; and "whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A " 'pattern of criminal gang activity' " may be established by proving two or more criminal convictions by gang members for certain enumerated offenses (§ 186.22, subd. (e)), known as predicate offenses.

In *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), our Supreme Court held, "When any expert relates to the jury case-specific out-of-court statements, and treats the

content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Id*. at p. 686.) The *Sanchez* court described case-specific facts as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) The court stressed that its decision does not affect "the traditional latitude granted to experts to describe background information" concerning the expert's "knowledge and expertise and premises generally accepted" in the expert's field (*id*. at p. 685), and that background information in a gang case may encompass "general gang behavior," including a particular gang's conduct and territory. (*Id*. at p. 698.) The court explained that an expert may still rely on hearsay in forming an opinion, and may tell the jury in general terms that she is doing so. (*Id*. at p. 685.) But "[w]hat an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.) The *Sanchez* court concluded that the gang expert's testimony in that case, which recounted facts contained in various police reports and notices, was case-specific hearsay used to prove the intent element of the gang enhancement—that the defendant had committed the underlying crimes with intent to benefit the gang. (*Id.* at pp. 698–699; § 186.22, subd. (b)(1).)

The *Sanchez* court further held that a confrontation clause violation results when the prosecution's expert in a criminal case relates case-specific testimonial hearsay without establishing both the defendant's prior opportunity for cross-examination (or forfeiture of that right) and the declarant's unavailability. (*Sanchez*, *supra*, 63 Cal.4th at p. 686.) Guided by the holding in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) that the primary object of the confrontation clause is testimonial hearsay (*id*. at p. 53), and by United States Supreme Court cases applying that holding, the *Sanchez* court concluded that "statements about a completed crime, made to an investigating officer by a nontestifying witness … are generally testimonial unless they are made in the context of an ongoing emergency … or for some primary purpose other

than preserving facts for use at trial." (*Sanchez*, at p. 694.) Further, those statements do not lose their testimonial character when summarized in an officer's report. (*Ibid*.) The *Sanchez* court concluded further that a field identification card, also memorializing police contact with gang-related individuals, would be *testimonial* if generated in the course of an ongoing criminal investigation. (*Id*. at p. 697.) In the wake of *Sanchez*, appellate courts have deemed admissions made during informal interactions between gang members and law enforcement to be *non-testimonial* hearsay. (*People v. Valadez* (2013) 220 Cal.App.4th 16, 32; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 585.)

The defendant in *Sanchez* did not challenge the gang expert's testimony as it related to the existence of a criminal street gang under section 186.22, subdivision (f) (established in part by proving predicate offenses), nor did the *Sanchez* court address whether facts related to predicate offenses are case-specific. In our view, testimony establishing a predicate offense, including a predicate offender's gang affiliation at the time of the offense, is case-specific under *Sanchez* because the facts are beyond the scope of a gang expert's general knowledge. This accords with the majority of courts that have addressed the issue. (*People v. Lara* (2017) 9 Cal.App.5th 296, 337 [predicate offense is an element of the gang enhancement]; *People v. Ochoa*, *supra*, 7 Cal.App.5th 575, 583, 588–589 [analogizing predicate offender's gang-membership admission to the *Sanchez* court's example of a diamond tattooed on the arm of an associate of the defendant as a case-specific fact]; but see *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1174–1175 [expert testimony about a gang's "pattern of criminal activities" was not case-specific because it was unrelated to the " '*particular events and participants* alleged to have been involved in the case being tried' "], review granted on other issue March 22, 2017, S239442).)

Improperly admitted hearsay ordinarily constitutes statutory error under the Evidence Code. (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) We analyze prejudice of such an error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which provides for

reversal only when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (Accord Evid. Code, § 353, subd. (b) [precluding relief from judgment unless the erroneous admission of evidence "resulted in a miscarriage of justice"].) But error amounting to a confrontation clause violation is reviewed under the heightened "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*Sanchez*, at p. 698.)

## 2. Elements of a Criminal Street Gang Under Penal Code Section 186.22, subdivision (b)

Defendant argues in his opening brief (filed before the Supreme Court issued the *Sanchez* decision) that Detective Ferrante's testimony regarding the Asian Boyz's primary activities, number of members, and identifying symbols was inadmissible testimonial hearsay because it was based on arrest records, police reports, field information cards, and conversations with colleagues.

The *Sanchez* decision affirmed the long-held view that "an expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds." (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) The *Sanchez* court distinguished case-specific facts from "background information regarding [a gang expert's] knowledge and expertise and premises generally accepted in [the] field," and described general gang behavior, and a particular gang's conduct and territory as background testimony. (*Id.* at pp. 685, 698.) Thus, Detective Ferrante's testimony regarding the Asian Boyz's clothing, symbols, number of members, and primary activities is background information not subject to exclusion on hearsay grounds or deemed testimonial. Defendant tacitly concedes that point by failing to argue in his post-*Sanchez* reply brief that those facts are case-specific.

## 3. Defendant's Gang Membership

Defendant argues that Detective Ferrante's testimony that she had "come across information from law enforcement officials that [he had] bragged about his affiliation

15

with the Asian Boyz gang" was testimonial hearsay. While not an element of the underlying offenses, defendant's gang membership is a case-specific fact under *Sanchez* because it is relevant to whether he acted "for the benefit of … or in association with any criminal street gang," and "with the specific intent to promote … or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1); *Sanchez*, *supra*, 63 Cal.4th at p. 698.)

The testimony complained of related two levels of hearsay—Detective Ferrante related law enforcement summaries of statements by defendant. But defendant has not established on this record that *his* statements to law enforcement were testimonial (we understand them to be from jail classification records), and they are otherwise admissible hearsay under Evidence Code section 1220. Even if the trial court erred by allowing Detective Ferrante to relate the first level of hearsay (statements made by other law enforcement officials), the error would be harmless under *Watson* because Detective Ferrante's opinion that defendant was a member of the Asian Boyz was supported by non-hearsay evidence including the location of the attack in an area frequented by Asian Boyz gang members, the attackers acting in concert, Julian's testimony that one of the attackers said "[w]hat up, cuz" (a phrase used by members of Crip-affiliated gangs), and someone yelling "Asian Boyz" after the attack. She based her opinion that defendant was a member of the Asian Boyz in part on the testimony of probation officer Thomas who, having continual contact with gang members and knowing their pattern behavior, testified that defendant would congregate with Asian Boyz gang members, which "you don't do [ ] unless you are a gang member." Detective Ferrante also testified about photos, music, and Facebook chats maintained by defendant; clothing found in his bedroom; and the tattoo on his shoulder.

### 4. Predicate Offenses

Defendant argues that Detective Ferrante's testimony relating the predicate offenses was inadmissible hearsay under *Sanchez*. He argues that facts establishing

16

predicate offenses are case specific because predicate offenses are necessary elements of the gang enhancement, that Detective Ferrante had no personal knowledge of the predicate offenses and obtained the facts from hearsay sources, and that the hearsay was testimonial because the information was ultimately gathered by officers acting in an investigatory capacity for purposes of prosecution. He acknowledges that certified court records were admitted to establish the convictions, but contends those documents were insufficient to establish the predicate crimes.

The prosecution presented evidence of predicate offenses committed by three persons: Romero Duc Huynh unlawfully carried a loaded firearm on March 5, 2012; Kevin Minh Huynh unlawfully carried a loaded firearm on July 8, 2012; and Patrick Freitas committed residential burglary and assault with a deadly weapon on September 25, 2012. Each offense resulted in a conviction with a gang enhancement established by certified court documents. But the court documents do not establish the predicate offender's gang affiliation, and the prosecution relied on Detective Ferrante's testimony to make that connection.

### a. Gang affiliation of Romero Duc Huynh

Regarding the firearm offense committed by Romero Duc Huynh, Detective Ferrante determined that the offense was an Asian Boyz "pattern crime" by reviewing police reports and speaking with the arresting officer; she had no personal knowledge of the investigation of that offense. She related that Romero Duc Huynh was wearing gang clothing and admitted being an Asian Boyz gang member at the scene. Although Romero Duc Huynh's admission may have been testimonial hearsay, we are unable to make that determination on this undeveloped record. (*Ochoa*, *supra*, 7 Cal.App.5th at p. 586.) "[A]s no such contemporaneous objections were lodged, we cannot simply assume the admissions to gang membership related by [the gang expert] were testimonial hearsay." (*Id.* at p. 585.) Defendant's generalized pre-trial objection to any testimonial evidence that Detective Ferrante "is going to state in open court as her basis of evidence,"

17

including evidence establishing predicate facts, met with the same concern in the trial court. Indeed, the court explained that it was "a difficult thing to give specific rulings without specific items of evidence," and it was unable to make a pretrial ruling on defendant's objection as it related to the predicate offenses.

Even if that testimony were inadmissible hearsay under *Sanchez*, we find no prejudicial error in light of Detective Ferrante's other testimony establishing that Romero Duc Huynh was an Asian Boyz gang member: Detective Ferrante testified that she was familiar with Romero Duc Huynh, he was "actually a known gang member to my office and to a lot of other officers," he had "a pretty extensive history" with the department, and he had "Asian Boyz" tattooed on his chest. That testimony does not relate any hearsay statement, and it conveys that Detective Ferrante had personal knowledge of Romero Duc Huynh's status as an Asian Boyz member. Given that testimony, it is not reasonably probable that a result more favorable to defendant would have been reached had Detective Ferrante not testified about Romero Duc Huynh's admission (or other details of the predicate offense). (*Watson*, *supra*, 46 Cal.2d at p. 836.)

### b. Gang affiliation of Kevin Huynh

Detective Ferrante testified that she reviewed police reports regarding the firearm offense committed by Kevin Huynh, and when he was booked into jail for that offense, "through the conversations with them and through his tattoos, they were able to determine that he is a gang member." Based on one of his tattoos, Detective Ferrante opined that Kevin Huynh was a member of the Viet Boyz, a gang closely affiliated with the Asian Boyz. Again, although Detective Ferrante may have related some testimonial hearsay regarding Kevin Huynh's gang membership (it is unclear whether Detective Ferrante saw the identifying tattoo in a booking photo or whether she was relying on a hearsay description of the tattoo), we cannot make that determination on this undeveloped record. (*Ochoa*, *supra*, 7 Cal.App.5th at p. 586.)

18

Further, we would find no prejudicial error under *Sanchez* because it was defendant who elicited on cross-examination that Kevin Huynh had been "a validated Asian Boyz gang member," and that the term "validated" was used by law enforcement to signal a person's gang history. Under the invited error doctrine (see *People v. Harrison* (2005) 35 Cal.4th 208, 237), defendant cannot now complain of that testimony, which establishes Kevin Huynh's Asian Boyz membership.

### c. Gang affiliation of Patrick Freitas

Defendant has also failed to develop a record to support his challenge to Detective Ferrante's testimony as it relates to the predicate offense committed by Patrick Freitas. Defendant failed to object to Detective Ferrante's testimony that Freitas had admitted being an Asian Boyz gang member when he was arrested and had a fairly lengthy criminal history with gang affiliations. We therefore do not know the context of Freitas's admission or the particulars of his criminal history. Here again, defendant cannot show prejudice on this record in light of his cross-examination, where he elicited in the first instance that Freitas "was also a known gang member," and "had some gang tattoos," including "an 'A' tattooed on his chest," "an 'AB' on his left hand," and "a '126' on his left arm."

### C. PERMISSIBLE SCOPE OF EXPERT OPINION

Defendant argues that the trial court committed prejudicial error by allowing Detective Ferrante to provide an expert opinion as to whether he had committed the charged offenses for the benefit of the gang, under section 186.22, subdivision (b)(1). We understand his argument to be twofold: (1) expert opinion regarding whether the charged offenses were committed for the benefit of the Asian Boyz was improper in scope because the jury was capable of deciding that element of the gang enhancement without the assistance of an expert; and (2) in the course of offering her opinion, Detective Ferrante improperly testified to the ultimate issue that defendant had committed the underlying assault.

19

### 1. Legal Background

An expert is someone with "special knowledge, skill, experience, training, or education" in a particular field (Evid. Code, § 720) who may testify in the form of an opinion when it will assist the jury "to understand the evidence or concepts beyond common experience." (*People v. Torres* (1995) 33 Cal.App.4th 37, 45; Evid. Code, § 801.) "Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness." (*Torres*, at p. 45.) " 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support [a gang enhancement under] section 186.22, subdivision (b)(1)." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).)

Experts may be asked questions that coincide with the ultimate issue in a case (Evid. Code, § 805; *People v. Prince* (2007) 40 Cal.4th 1179, 1227), but they cannot offer an opinion on whether a defendant is guilty because "the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*Torres*, *supra*, 33 Cal.App.4th at p. 47; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) If an expert has knowledge of the actual facts of a case derived from his or her own observation, the expert may give an opinion based on those facts. (Witkin, 3 Evid. § 212, p. 313.) Although the traditional method of eliciting opinion testimony from an expert witness is the hypothetical question based closely on the evidence of the case being tried (*Vang*, *supra*, 52 Cal.4th at p. 1046), an expert may also provide an opinion based on other witnesses' testimony presenting no factual conflicts or contradictions. (*Estate of Collin* (1957) 150 Cal.App.2d 702, 712–715.)

We review the trial court's evidentiary rulings related to expert testimony for abuse of discretion. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)

### 2. Need for Expert Testimony

As part of his in limine motion to limit Detective Ferrante's testimony, defendant objected to expert opinion testimony addressing whether the offenses had been

20

committed to benefit a street gang, asserting that the issue was not sufficiently complex. But defendant did not seek a ruling on that objection when the motion was heard and the court explicitly asked what matters remained outstanding, nor did he object to the opinion during the testimony itself. Defendant has therefore forfeited his argument that expert testimony was not needed to establish the "for the benefit" element of the gang enhancement.

Even if not forfeited, the argument is meritless. It is within the trial court's discretion to allow expert testimony on whether an offense was committed for the benefit of a gang. (*Vang*, *supra*, 52 Cal.4th at p. 1048.) The court in *Vang* was clear: "[N]o statute prohibits an expert from expressing an opinion regarding whether a crime was gang related. Indeed, it is settled that an expert may express such an opinion." (*Id*. at p. 1052.) While the court in *People v. Valdez*, *supra*, 58 Cal.App.4th 494 observed that general expert testimony on gangs could preclude the need for an expert to opine on whether a crime was committed for the benefit of a gang in a hypothetical case devoid of factual complexity (*id*. at p. 508), that dicta does not foreclose the exercise of discretion here. Detective Ferrante's opinion "[r]elated to a subject"—gang criminality—"that is sufficiently beyond common experience." (Evid. Code, § 801, subd. (a).) No abuse of discretion occurred by permitting Detective Ferrante to opine that the attack was retaliatory, even if she had explained gang retaliation in her background testimony.

### 3. Form of Expert Testimony

After Detective Ferrante provided the basis for her opinion that defendant was an Asian Boyz gang member, the prosecutor asked: "Based upon everything you learned throughout this case, do you think that the assault with a blunt object on Julian [ ] was done for the benefit of the gang?" Defendant objected to that question as an improper hypothetical and moved to strike Detective Ferrante's affirmative response. The court overruled the objection, clarifying that the prosecutor was asking for an opinion even though he had used the word "think." Detective Ferrante explained that her opinion was

21

based on the concepts of respect and retribution—that it was incumbent on a gang member who loses a fight to retaliate for his own benefit as well as to restore the dignity of the gang.

After asking Detective Ferrante whether she had heard the testimony that a mini sledgehammer was found in a car that defendant acknowledged was his (to which Detective Ferrante responded yes), the prosecutor asked her whether she had an opinion about whether that possession would benefit the gang. Detective Ferrante said yes, and explained that gang members carry weapons on a regular basis both to protect themselves and to try to assault people. Next the prosecutor asked Detective Ferrante whether Officer Guerra's testimony relating that a mini sledgehammer had been used against Julian affected her opinion as to whether possession of a mini sledgehammer within a couple of months of that time would benefit the gang. Again answering yes, Detective Ferrante explained, "being in a position where he had already assaulted somebody he knows, [] the chances of payback at that point is really good." The prosecutor concluded Detective Ferrante's direct examination by asking a series of hypothetical questions tracking the prosecution's presentation of evidence.

The prosecutor's first question ("Based upon everything you learned throughout this case, do you think that the assault with a blunt object on Julian [ ]was done for the benefit of the gang?") was improper in that it assumed that an assault had transpired, and the trial court's response to defendant's objection did not address the assumption. In the same way, Detective Ferrante's statement that defendant was "in a position where he had already assaulted somebody" was improper. Those errors, however, did not result in prejudice. Defendant has not shown a reasonable probability that the verdict would have been more favorable to him in the absence of the errors (*Watson*, *supra*, 46 Cal.2d at p. 837), or that the errors rendered the trial fundamentally unfair.

Detective Ferrante was offering an opinion on whether two of the charged offenses—assault and possession of a mini sledgehammer—were committed for the

22

benefit of a street gang. The jury was not mislead by the prosecutor's questions or Detective Ferrante's testimony into thinking that guilt of the underlying offenses was a foregone conclusion obviating the need for deliberation, as defendant argues. Detective Ferrante was not a percipient witness to the May 8 attack, she did not testify to what had happened that day, she never suggested that she knew whether or how Julian had been struck, and the prosecutor did not solicit her opinion as to whether defendant had committed an assault.

Further, the evidence pointed to several ways defendant could be found guilty of assault, which resulted in the prosecution devoting more than half of its closing argument to three theories upon which the jury could render a guilty verdict—one based on Julian's testimony that defendant had struck him with a blunt object; one based on Isaiah's statement to Officer Guerra that Julian had been struck by one of the others at the direction of defendant; and the last being conspiracy to commit assault based on defendant's statement to Detective Ferrante, the Facebook chat about "aiming for [Julian]," and the circumstances surrounding the retaliation. Given the prosecutor's focus on the different ways the jury could find defendant guilty of the assault, Detective Ferrante's reference to an assault in offering an opinion about the gang enhancement on count 6 did not improperly influence the jury.

D. SUFFICIENCY OF THE EVIDENCE

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We presume the "existence of every fact that the trier of fact could reasonably deduce from the evidence" to support the judgment. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) To overturn a conviction on this ground, "it must clearly appear

23

that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

### 1. Unlawful Possession of the Mini Sledgehammer

Count 6 alleged that on July 25, 2013, defendant "possess[ed] an instrument and weapon of the kind commonly known as a billy," "to wit a mini sledge hammer," in violation of Penal Code section 22210. Defendant makes a twofold argument that the conviction for count 6 is supported by insufficient evidence: (1) no evidence was presented establishing that the sledgehammer met the definition of a "billy," and (2) the circumstances surrounding the offense did not transform the sledgehammer, an otherwise lawful object, into an unlawful billy. We are not persuaded by either argument.

Penal Code section 22210 prohibits possession of "any instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slungshot." In *People v. Grubb* (1965) 63 Cal.2d 614 (*Grubb*), our Supreme Court rejected a constitutional vagueness challenge to the term "billy" under former section 12020, subdivision (a)(1).[3] The defendant in *Grubb*, convicted of possessing an altered baseball bat, argued that the term "billy" was unconstitutionally vague because it encompassed objects such as baseball bats, table legs, or pieces of lumber, which are ordinarily used in acceptable ways but could be used as weapons of physical violence. (*Grubb*, at pp. 620–621.) While the *Grubb* court acknowledged the Legislature's intent to outlaw instruments ordinarily used for unlawful purposes, it also concluded that "the Legislature sought … to outlaw possession of the sometimes-useful object when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicated that the possessor would use

---

[3] Former Penal Code section 12020, subdivision (a)(1) prohibited possession of "any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag." Section 22210 continued that prohibition without substantive change.

24

the object for a dangerous, not harmless, purpose." (*Id*. at pp. 620–621, citing *People v. Freeman* (1927) 86 Cal.App. 374, 376 (*Freeman*); see also *In re David V.* (2010) 48 Cal.4th 23, 28 ["long recogniz[ing] that [former] section 12020 was enacted … 'to outlaw sometimes-useful object,' " quoting *Grubb*, at pp. 620–621].)[4] The *Grubb* court held that the statute "embraces instruments other than those specially created or manufactured for criminal purposes" by including "objects 'of the *kind* commonly known as a billy,' " and it declared that the Legislature "decrees as criminal the possession of ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger." (*Grubb*, at p. 621.)

A more recent case addresses the scienter element of unlawful possession of instruments or weapons under former section 12020, subdivision (a)(1). In *People v. King* (2006) 38 Cal.4th 617 (*King*), our Supreme Court rejected the Attorney General's argument that instruments coming within that section never could be possessed lawfully. (*Id*. at p. 626.) Citing *Grubb*, the *King* court noted that a baseball bat or table leg, each of which has a utilitarian purpose, may qualify as a billy. (*Id*. at p. 624.) Thus, "where the object [which qualifies as an unlawful weapon under section 22210] may have a legitimate and lawful use," *Grubb* requires "that there be evidence tending to show that, at the time and place of the alleged illegal possession, the possessor contemplated the unlawful and not the lawful use." (*People v. Deane* (1968) 259 Cal.App.2d 82, 89.)

---

[4] The court in *Freeman* addressed whether a large unloaded revolver was a "dangerous or deadly weapon" under former section 211a, which defined first degree robbery as " 'perpetrated … by a person being armed with a dangerous or deadly weapon.' " (*Freeman*, *supra*, 86 Cal.App. at p. 375.) While it is not clear to us how the meaning of a "dangerous or deadly weapon" under former section 211a reveals legislative intent in enacting a different statute prohibiting possession of sap-type instruments, under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 we are bound by the Supreme Court's holding in *Grubb*.

### a. Definition of "billy"

While the Supreme Court has recognized that baseball bats and table legs may qualify as billies (*King*, *supra*, 38 Cal.4th at p. 624), we are unaware of any precedent addressing whether a mini sledgehammer, or any hammer for that matter, may qualify as an "instrument … of the kind commonly known as billy" under section 22210. As "the prosecution must prove that the item had the necessary characteristic to fall within the statutory description" (*King*, at p. 627), and there is no statutory definition of billy (cf. *In re David V.*, *supra*, 48 Cal.4th at p. 27 [statutory definition of metal knuckles controls]), we will look to dictionary definitions to determine whether the jury was properly instructed on the characteristics of a billy as a matter of law. (*People v. Mayberry* (2008) 160 Cal.App.4th 165, 169 [the criteria by which the characteristics that define an item subject to section [22210] are measured is a question of law].)

Webster's Third New International Dictionary defines a billy as "a heavy usually wooden weapon for delivering blows." A club is defined as "a heavy staff especially of wood usually tapering and sometimes having an attached head of stone or metal wielded with the hand as a striking weapon." A bludgeon is defined as "a short stick used as a weapon usually having one thick, heavy, or loaded end." A truncheon is defined as "a heavy club," and "a policeman's billy." And a cudgel is defined as "a short heavy stick that is shorter than a quarterstaff and is used as an instrument of punishment or a weapon." (Webster's Third New Internat. Dict., Unabridged (2018) <http://unabridged.merriam-webster.com> [as of Jan. 18, 2018].) The Oxford English Dictionary provides similar definitions: A billy is "[a] highwayman's club; a bludgeon," and "a policeman's truncheon." A club is defined as "[a] heavy stick or staff for use as a weapon, thin enough at one end to be grasped with the hand, and increasing in thickness and weight towards the other end." A bludgeon is defined as "a short stout stick or club, with one end loaded or thicker and heavier than the other, used as a weapon." A truncheon is defined as "a short thick staff; a club, a cudgel." And a cudgel is defined as

26

"a short thick stick used as a weapon; a club." (Oxford English Dictionary Online, Sept. 2017 <http://www.oed.com> [as of Jan. 18, 2018].)

The jury was instructed: "A billy means a club or a stick, a truncheon, especially one carried by a police officer. [¶] A truncheon is a short thick cudgel or any staff or baton of authority or policeman's stick or billy. [¶] A cudgel is a short stick with a metal end capable of being used as a weapon." Those definitions comport with the dictionary definitions we have identified, and thus convince us that the trial court properly instructed the jury on the definition of a billy.

The mini sledgehammer was admitted in evidence, and Officer Vanderbroeck, who found the item during the search of defendant's residence, noted its wooden handle and "metal part." The prosecutor described the item as having "a short stick and a metal end capable of being used as a weapon." We have reviewed a photograph of the mini sledgehammer substituted for the hammer itself as part of the trial court record. The photograph depicts an oblong metal head, approximately 5 inches long and 1.5 inches tall, affixed to a wooden handle approximately 15 inches long. Because the mini sledgehammer had "the necessary characteristic[s]" of a billy (*King*, *supra*, 38 Cal.4th at p. 627), a jury could find that it came within the meaning of an "instrument or weapon of the kind commonly known as a billy," under section 22210.

### b. Possession of the billy as a weapon

Substantial evidence supports the jury's finding that the mini sledgehammer was possessed as a weapon. Defendant had acknowledged in a Facebook message that the hammer was a weapon; no evidence was presented that he possessed the hammer for a lawful purpose; Detective Ferrante explained that gang attacks are met with retaliation; and defendant had admitted using another ordinarily harmless object (a crowbar) to retaliate against Julian. Further, defendant admitted ownership of the Toyota Corolla; the

27

hammer, which was found under the front passenger seat with virtually the entire handle protruding onto the rear floorboard, was readily accessible to someone driving the car.

Relying on language in *Grubb* that possessing an ordinarily harmless object is unlawful when the circumstances of possession "demonstrate an immediate atmosphere of danger," defendant argues that the prosecution failed to establish circumstances pointing to unlawful possession because he was sleeping in the house when the mini sledgehammer was seized from his car. But *Grubb* does not help defendant because the Supreme Court made clear that imminent use of the object in a harmful manner does not have to be established to show unlawful possession. Indeed, the baseball bat in *Grubb* was found in a car that had broken down on the side of the road with the driver nowhere in sight. (*Grubb*, *supra*, 63 Cal.2d at p. 616.) Even without the driver's admission to carrying the bat in automobiles for self-defense, the *Grubb* court concluded that possession of the bat—"carried about in the car, obviously usable as a 'billy,' clearly not transported for the purpose of playing baseball"—violated the statute. (*Id.* at p. 621.) As in *Grubb*, the circumstances here are sufficient to show that defendant "contemplated the unlawful and not the lawful use" of the mini sledgehammer. (*People v Deane*, *supra*, 259 Cal.App.2d at p. 89.)

### 2. Gang Enhancement for Unlawful Billy Possession

Defendant argues the evidence was insufficient to support the gang enhancement for count 6 because there was no evidence that the mini sledgehammer was used in the May 8 assault, and Detective Ferrante's opinion by itself was insufficient to prove the enhancement. He argues the facts are similar to those in *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*), and *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), where gang enhancements were vacated for lack of substantial evidence.

Defendant's argument fails for two reasons. First, the California Supreme Court emphasized in *Vang* that " '[e]xpert opinion that particular criminal conduct benefited a

28

gang' is not only permissible but can be sufficient to support [a gang enhancement under] section 186.22, subdivision (b)(1)." (*Vang*, *supra*, 52 Cal.4th at p. 1048.) *Vang* undermines the earlier view expressed in *Frank S.* that the expert there had offered an improper opinion on whether possession of the weapon was committed for the benefit of a criminal street gang under section 186.22, subdivision (b)(1). (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1199.)

Second, the instant case is distinguishable from *Frank S.* and *Ramon*. In *Frank S.*, a minor carrying a concealed fixed blade knife while riding a bicycle said he had been attacked two days earlier and needed the knife for protection against " 'the Southerners,' " and he identified himself as a Norteño affiliate during intake at a juvenile detention facility. (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1195) Based on those facts, the expert opined that the minor was an active Norteño, that gang members used knives for protection from and to assault rival gang members, and that the minor's possession of the knife benefited the Norteños because it provided them with protection should they be assaulted. (*Id.* at pp. 1195–1196.) The *Frank S.* court explained that the expert's opinion relating the minor's intent with respect to possession of the knife was based on insufficient evidence, noting that the prosecution presented no evidence that the minor was in gang territory, was with gang members, or had any reason to expect to use the knife in a gang-related offense. (*Id.* at p. 1199.)

The defendant in *Ramon* was charged with receiving a stolen vehicle, being a felon in possession of a firearm, being an active gang member in possession of firearm, and unlawfully carrying a loaded firearm in public, with gang enhancements. (*Ramon*, *supra*, 175 Cal.App.4th at p. 846.) He and his passenger were both gang members stopped in their gang's territory in a stolen vehicle with a gun under the driver's seat. Based on those facts, the expert in *Ramon* opined that the defendant was acting on behalf of his gang because the stolen vehicle and gun "could be used to facilitate the

29

commission of a crime." (*Id*. at p. 849)  The appellate court found those facts insufficient to support an opinion about the defendant's specific intent in that case.  (*Id*. at p. 852.)

In contrast, here the evidence showed that defendant had recently been involved in a gang-related retaliatory attack against Julian.  One of the weapons used in that attack was described as a "short handled sledgehammer" and a "construction hammer" with a "metal end," descriptions consistent with the mini sledgehammer found in defendant's car.  Detective Ferrante's opinion that the mini sledgehammer was possessed for the benefit of a criminal street gang was based on defendant having been involved in that orchestrated gang attack and needing a weapon to protect against anticipated retaliation.  Detective Ferrante's opinion, together with the evidence showing that a hammer similar if not identical to the hammer found in defendant's car was used in the May 8 attack, is substantial evidence that defendant possessed the mini sledgehammer for the benefit of the Asian Boyz gang.

## IV.    DISPOSITION

The judgment is affirmed.

30

_____

Grover, J.

**WE CONCUR:**


_____

Elia, Acting P. J.


_____

Premo, J.


**H042184 - *The People v. Huynh***

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court, Case No.: C1360508 |
| Trial Judge: | Hon. Arthur Bocanegra |
| Attorneys for Plaintiff/Respondent: The People | Xavier Becerra<br>  Attorney General of California<br>Gerald A. Engler<br>  Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>  Senior Assistant Attorney General<br>Eric D. Share<br>  Supervising Deputy Attorney General .<br>Leif M. Dautch<br>  Deputy Attorney General |
| Attorneys for Defendant/Appellant: Michael Huynh | Julia K. Freis,<br>  Attorney at Law<br>  Under Appointment by the Court of Appeal |