Filed 10/4/21  P. v. Lazo CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B304615 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA144673-01) |
| v. | |
| ALEJANDRO LAZO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed in part and reversed in part.

Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and Eric J. Kohn, Deputy Attorneys General for Plaintiff and Respondent.

_____

On April 29, 2017, Southside Whittier gang members Alejandro Lazo and Reyna Gomez carjacked a Nissan Pathfinder and used the vehicle in a drive-by shooting spree that left one person dead and several others injured. Lazo and Gomez were charged with one count of carjacking, one count of murder, and 14 counts of attempted murder. They were tried separately.[1]

A jury convicted Lazo of one count of first degree murder (count 1; Pen. Code, § 187, subd. (a))[2], 12 counts of willful, deliberate, and premeditated attempted murder (counts 2, 3, 6–11, 13–15, & 17; §§ 187, subd. (a), 664), and one count of carjacking (count 12; § 215, subd. (a)).[3] As to each count, the jury found true gang allegations under section 186.22, subdivision (b)(4), and firearm enhancement allegations under one or more of subdivisions (b), (c), (d), and (e)(1) of section 12022.53. The court sentenced Lazo to prison for 53 years plus 320 years to life, and imposed certain fines and assessments.

Lazo contends that the evidence was insufficient to support three of the convictions of attempted murder (counts 2, 8, and 14) and, in connection with those convictions, the court erred in giving kill zone instructions to the jury and the prosecutor

---

[1] In March 2020, we affirmed Gomez's convictions of one count of murder, 10 counts of attempted murder, and one count of carjacking in an unpublished opinion. (*People v. Gomez* (Mar. 4, 2020, B293727).) We reversed convictions on four counts of attempted murder and related enhancements based on instructional error. (*Ibid.*)

[2] Subsequent unspecified statutory references are to the Penal Code.

[3] The jury acquitted Lazo of two charges of attempted murder.

made improper comments to the jury regarding the kill zone theory.  We agree with Lazo that the evidence was insufficient to support the challenged convictions and therefore reverse those convictions.  Consequently, we do not reach the related instructional and prosecutorial misconduct issues.

Lazo also contends that gang enhancements must be reversed because (1) the gang expert's testimony regarding predicate offenses was based on hearsay concerning case-specific facts and was therefore inadmissible; and (2) the evidence was insufficient to establish that the crimes were committed for the benefit of or in association with a criminal street gang.  In light of our Supreme Court's recent decision in *People v. Valencia* (2021) 11 Cal.5th 818, 826 (*Valencia*), we agree with the first contention, but hold that the error was harmless with respect to all gang enhancements except the enhancement associated with the carjacking count.  We reject the second contention.

Lazo further argues that the prosecutor committed prejudicial misconduct and deprived him of a fair trial because exhibits in evidence improperly included information about a prior conviction and Lazo's parole status, and the prosecutor made improper statements during his argument to the jury.  He also argues that the prosecutor committed misconduct in various ways during a re-argument of the murder charge to the jury.  In addition to finding that these contentions have been forfeited by failing to raise them below, we reject them on the merits, as well as the related ineffective assistance of counsel contentions.

## FACTUAL SUMMARY

The events described below took place on April 29, 2017.

### A.  *Carjacking of Johnny G.'s Pathfinder (Count 12)*

At about 2:15 p.m., Johnny G. was in the driver's seat of his parked green Nissan Pathfinder sports utility vehicle (SUV) when a white four-door sedan pulled up behind him. Lazo and Gomez got out of passenger seats of the white car and approached the Pathfinder.  Lazo walked to the driver's side of the Pathfinder and Gomez to the passenger side.  Lazo pointed a gun at Johnny G., and told him to get out of the car.  Johnny G. complied because he was afraid Lazo would shoot him.  After Johnny G. walked to the back of the Pathfinder, Lazo got in the driver's seat and Gomez got into the passenger seat.  Lazo then drove away.

As Johnny G. began to walk away, two men got out of the white car, approached Johnny G. and asked, "Where are you from?"  Johnny G. said, "I don't bang."  The two men said something like, "this is South Side," then returned to their car and followed the Pathfinder.[4]

---

[4] During trial, Johnny G. testified that Lazo looked "similar" to the man who had pointed the gun at him, but he was "not a hundred percent sure" it was him.  Some witnesses to other charged crimes positively identified defendant during trial as a principal and other witnesses either could not identify defendant or expressed some uncertainty about their identification.  On appeal, however, defendant does not challenge the sufficiency of the evidence supporting the jury's finding that he was a principal in each of the crimes of which he was

4

### B.  *Attempted Murder of Tommy A. (Count 15)*

At about 3:30 p.m., Tommy A. was in an alley behind a coffee shop.  A green Pathfinder pulled up next to him.  Lazo, the driver of the Pathfinder, handed a gun to Gomez and told her, "shoot him."  Gomez aimed the gun at Tommy A.'s face, then lowered the gun and fired one shot, hitting Tommy A. in his groin area.  Gomez then raised the gun, aimed it at Tommy A.'s head, and pulled the trigger.  The gun, however, "jammed."  As Lazo attempted to clear the jam, the car began to roll away.  Tommy A. then ran to the coffee shop to ask for help.

### C.  *Attempted Murder of Michael L. (Count 17)*

At about 3:41 p.m., Rosemary A. and her husband Roy A. were in their car, waiting for the light to change at the intersection of Colima and Lambert in Los Angeles County.  Rosemary A. was driving.  A car, which Roy A. described as a dark green or black SUV was in front of them.  A black Honda was in the next lane, adjacent to the driver's side of the SUV in front of them.  Rosemary A. could see one person inside the Honda, who was later identified as Michael L.  Rosemary A. saw an arm holding a gun extended from the driver's side of the SUV in front of her and point it at the Honda.  She then heard one shot and saw the front passenger window of the Honda shatter.  The SUV turned right and "took off."  Rosemary A. began to

---

convicted and the sufficiency of evidence supporting that finding is apparent from the record and we may reasonably infer from the evidence, viewed in a light favorably to the judgment, that the male participant in each of the crimes is Lazo and the female participant is Gomez.  Our factual summary reflects these inferences.

follow the SUV and told Roy A. to get the vehicle's license number. Rosemary A. then turned back to check on the person in the Honda. Michael L. had been injured by broken glass from the shattered window. A surveillance video recording of the incident was shown to the jury.[5]

### D. *Attempted Murders of Benjamin G. and Maria G. (Counts 13 and 14)*

At about 4:00 p.m., Benjamin G. was driving his Ford Excursion on Imperial Highway. His wife Maria G. was in the passenger seat. They stopped at the intersection at La Mirada Boulevard. A green Pathfinder pulled up next to them on their driver's side. Lazo was driving the Pathfinder and Gomez was in the front passenger seat. The light changed to green and, as the two cars proceeded through the intersection, Benjamin G. heard two loud knocks against his car. Benjamin G. looked at the adjacent Pathfinder and saw Lazo "pointing a gun sideways." Then Benjamin G.'s window shattered and a bullet hit his arm and ribs. The Pathfinder sped away. In addition to the shattered window, two holes were found in the driver's door of Benjamin G.'s car.

### E. *Attempted Murder of Anthony E. (Count 11)*

At about 4:00 p.m., Anthony E. was driving his car westbound on Imperial Highway between Santa Gertrudes Avenue and Ocaso Avenue. He heard a noise and a rear side window in his car shattered. He then noticed a dark green SUV driving away from him eastbound on Imperial Highway.

---

[5] The parties did not arrange for transmission of the video surveillance evidence to this court.

He later discovered a hole in the driver's side back seat of his car and a fragment of a bullet inside the hole.

### F. *The Shootings at the Intersection of Santa Gertrudes Avenue and Alicante Road*

At about 4:00 p.m., Lazo and Gomez were involved in a series of shootings at the intersection of Santa Gertrudes Avenue and Alicante Road.

#### 1. *Murder of Jose Sahagun (count 1) and attempted murder of Jesus A. (count 2),*

Jose Sahagun was driving a white SUV southbound on Santa Gertrudes Avenue and pulled up to the intersection at Alicante Road, where he waited for the light to change. Sahagun's father-in-law, Jesus A., was in the front passenger seat. Sahagun's wife and three other family members were in rear seats of the SUV. Lazo drove the Pathfinder up alongside the driver's side of Sahagun's white SUV. Gomez got out of the passenger side of the Pathfinder, approached the driver's side of Sahagun's SUV, and fired at least one shot, and possibly as many as three shots, at Sahagun from less than one foot away. Sahagun died as a result of gunshot wounds. There was no evidence that anyone else in the car, including Jesus A., was injured or that any bullets hit or entered the cabin of the Sahagun's SUV other than the bullet or bullets that hit Sahagun.

#### 2. *Attempted murders of Lisa R. (count 3), Julio R. (count 6), Leslie G. (count 7), Robert G. (count 8), Leticia A. (count 9), and William K. (count 10)*

Across the intersection from where Gomez shot Sahagun, several northbound cars were stopped at the red light. Lisa R.

7

and her 10-year-old daughter were in the lead car in the left-turn lane. Lisa R. saw Gomez shoot at the window of Sahagun's SUV. After Gomez returned to the Pathfinder, the Pathfinder proceeded slowly through the intersection. When it was nearly adjacent to Lisa R.'s car, Lazo pointed a semiautomatic handgun at Lisa R. and fired one shot at her. The bullet shattered her driver's side window and the rear passenger window. Lisa R. received a small cut under her eye as a result. Her daughter was not injured.

Jorge N. was heading northbound on Santa Gertrudes Avenue in the number two lane and stopped at the intersection with Alicante. Jorge N. heard several gunshots, but did not know where they came from. He noticed a commotion, then saw the green Pathfinder driving southbound slowly through the intersection. He saw Lazo holding a gun outside the window and shooting at cars in the northbound lanes. To Jorge N., it appeared that the driver was taking aim at cars and shooting directly at them. At one point, the shooter pointed the gun at Jorge N. and he "had no choice but to just get out of the way." He then heard "the last shot." Jorge N. was not injured and his car was not hit.

Julio R. was in his GMC Sierra and waiting in a northbound lane for the light to change. He heard a gunshot and noticed a commotion and someone running on the other side of the intersection. He heard a second shot and saw the driver's side window of Sahagun's SUV shatter. The green Pathfinder then moved southbound across the intersection as an arm holding a gun extended from the driver's window of the Pathfinder. As the Pathfinder reached the south side of the intersection, Lazo fired shots at each of the three cars in front of him. When the

Pathfinder reached a point adjacent to Julio R.'s vehicle, Julio R. saw Lazo point the gun at him and pull the trigger twice, but it did not fire. As the car passed him, Julio R. heard more gunshots.

Leticia A. was behind two other cars in the northbound-facing left-turn lane on Santa Gertrudes Avenue. She saw Gomez shoot at Sahagun's SUV. After Lazo drove through the intersection and shot at the cars in front of him, he pulled up adjacent to Leticia A. and fired a gun at her as she ducked.

Leslie G. and her husband Robert G. were in a car facing northbound at the Santa Gertrudes Avenue/Alicante Road intersection. They were in the "number [one] lane," about three cars away from the limit line. Leslie G. was driving and Robert G. was in the front passenger seat. Their two-year-old son was in the backseat. Leslie G. heard three gunshots and saw the green Pathfinder cross the intersection and pull up to a point "parallel" to her car and stop. Although she was in the lane to the right of the left-turn lane, no car was next to her in the left turn lane. Lazo raised a gun and pointed it in her direction; Leslie G. told Robert G. to duck. Lazo fired two or three shots at their car. A bullet hole and a bullet fragment were found in the driver's side mirror of Leslie G.'s car.

William K. was at the Santa Gertrudes Avenue/Alicante Road intersection heading northbound. He heard three shots, and saw the Pathfinder drive southbound across the intersection. The Pathfinder stopped, and Lazo pointed a gun at William K., fired, and hit William K.'s windshield.

### G.    *The Aftermath*

At 7:00 p.m., Los Angeles County Sheriff's Deputies located Johnny G.'s Pathfinder near Mayberry Park in Whittier. On the

9

ground about 6 to 10 feet away from the driver's side door, they found a "live round" of "ammo." A subsequent search of the Pathfinder revealed a live .22 caliber cartridge, fired cartridge casings, and a box of .22 caliber ammunition.

Between 7:30 p.m. and 8:00 p.m., a black Chrysler and a white Kia sedan were in the parking lot of a motel in Santa Fe Springs. According to a motel guest, a male passenger got out of the Chrysler, said, "Hey, homey," and fired eight or nine gunshots at the white Kia. The shooter returned to the Chrysler, which drove away. The white Kia then drove out of the motel parking lot.

At about 8:00 p.m., Gomez, driving the white Kia sedan, pulled up alongside Joyce F. on Carmenita Road and honked her horn repeatedly. Gomez rolled down her window and told Joyce F. that she had been shot and asked for help. Lazo was in the passenger seat of the Kia and had also been shot. Joyce F. noticed that the passenger side of the car and rear windshield had "a lot" of bullet holes.

An ambulance and police officers arrived. Police found a .22 caliber handgun between Lazo's waistband and the seatbelt clip. As Lazo was being placed on a gurney, .22 caliber ammunition fell from his pants pocket onto the ground.

DNA recovered from a beer can in the Pathfinder was consistent with Lazo's and Gomez's DNA. DNA found on the Pathfinder's steering wheel was consistent with Lazo's DNA. Gunshot residue was found on Lazo and Gomez. Ballistics evidence connected the .22 caliber gun found next to Lazo with the cartridge cases found in the Pathfinder and the bullet recovered from Sahagun's body.

10

## H.  *Gang Evidence*

Los Angeles County Sheriff's Deputy Claudia Maldonado testified that Lazo has "SSW"—an acronym for Southside Whittier—tattooed on his arm and head.  The deputy encountered Lazo at Mayberry Park on April 4 and April 9, 2017, and each time Lazo "self-admitted" at that time to being a gang member.  On the second occasion, Lazo was with Gomez, who also admitted being "from Southside Whittier."  Maldonado prepared field identification—or F.I.—cards for each interaction, which noted their gang affiliation, tattoos, and gang monikers.

Deputy Fernando Sarti testified as a gang expert.  Sarti testified that the primary activities of the Southside Whittier gang are vandalism, petty thefts, robberies, sales of narcotics, carjacking, possession of handguns, shootings, and murders.  The gang's "territory" includes Mayberry Park, where Southside Whittier gang members congregate.

Deputy Sarti testified about two "predicate" crimes purportedly committed by Southside Whittier gang members.  The crime in each case was being a felon in possession of a firearm.  One of the crimes is evidenced by a court minute order reflecting a conviction of Jose Antonio Garcia on March 18, 2016.  The other crime is shown by a court minute order reflecting a conviction of Richard Arredondo on October 23, 2015.  Deputy Sarti's testimony that Garcia and Arredondo were members of the Southside Whittier gang was based on the deputy's review of field identification cards and "arrest cards" concerning the individuals, tattoos on Garcia "depicting his gang affiliation," and booking photographs of Arredondo "where he depicts his gang affiliation."

11

Deputy Sarti further testified that Lazo and Gomez are active members of the Southside Whittier gang. He based this opinion on photographs of tattoos on Lazo and Gomez reflecting membership in the Southside Whittier gang and field identification cards prepared by others.

Over defense objection, the prosecutor gave Deputy Sarti a hypothetical that mirrored the facts shown by evidence in this case. Deputy Sarti stated his opinion that the crimes described in the hypothetical were committed for the benefit of, and in association with, a criminal street gang. The activity benefitted a gang, he explained, because the firing of a weapon "enhances the reputation of the gang within the gang world as well as within the community." The crimes are committed in association with a gang because "there's two individuals from the same gang working together to commit these crimes."

## I.    *Defense*

The defense did not present any witnesses or affirmative evidence.

## DISCUSSION

### A.    *Sufficiency of the Evidence of Attempted Murder on Counts 2, 8 and 14*

The convictions on counts 2, 8, and 14 were for the attempted murders of Jesus A., Robert G., and Maria G., respectively. These alleged victims were in the front passenger seats of the cars driven by Sahagun, Leslie G., and Benjamin G., respectively. The prosecution relied on a kill zone theory of criminal liability as to these crimes and the court instructed

12

the jury on that theory.[6]  Lazo contends that the evidence is insufficient to support the convictions on these counts under a kill zone theory.[7]  We agree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]  When a single act is charged as an attempt

---

[6] As to count 2, the court instructed the jury as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of Jesus [A.] in count 2, the People must prove that the defendant not only intended to kill Jose Sahagun, but also either intended to kill Jesus [A.], or everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Jose Sahagun or intended to kill Jesus [A.] by killing everyone in the kill zone then you must find the defendant not guilty of the attempted murder of Jesus [A.]"  The court gave the same instruction on counts 8 and 14, substituting the names of Robert G. and Maria G., respectively for the name of the alleged victim.

[7] The Attorney General contends that the evidence is sufficient to support the convictions under the kill zone theory and does not argue that the convictions can be affirmed under any other theory.

13

on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine."  (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

Although the doctrine of transferred intent does not apply to the crime of attempted murder, our Supreme Court has "embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder."  (*Canizales*, *supra*, 7 Cal.5th at p. 602.)  This concept was applied in *People v. Bland* (2002) 28 Cal.4th 313, where the court approved of a "kill zone" theory of attempted murder, which applies " 'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Id*. at p. 329.)  The Attorney General in this instant case relies on the kill zone theory to support the convictions on counts 2, 8, and 14.

In *Canizales*, the Supreme Court clarified that "the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes:  (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm— that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target[;] and (2) the alleged attempted murder victim

14

who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

The *Canizales* court further stated: "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. . . . [T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located.' " (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

The *Canizales* court anticipated that, in light of its refinement of the kill zone test, "there will be relatively few cases in which the theory will be applicable" and cautioned trial courts to "provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 608; see *People v. Cardenas* (2020) 53 Cal.App.5th 102, 112

15

(*Cardenas*) [under *Canizales*'s "strict requirements of the kill zone theory[,] the defendant must have *specifically intended to kill everyone* in the area around the primary target as a means of killing the primary target"].)  "The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Canizales*, *supra*, 7 Cal.5th at p. 608.)

*People v. Booker* (2020) 58 Cal.App.5th 482 (*Booker*) is instructive.  In *Booker*, codefendants Damon Booker and George Lewis were members of the Poccet Hood gang.  (*Id.* at p. 494.) They and other Poccet Hood gang members were in a liquor store where they saw Jose Raya speaking with someone who was a member of a Poccet Hood rival gang.  (*Id.* at pp. 488, 502.) Raya was not a member of a gang.  (*Id.* at p. 488.)  Raya and his girlfriend, Reann Lott, left the liquor store in Lott's car.  Raya was driving and Lott was in the front passenger seat.  (*Ibid.*) Lewis, with Booker in the passenger seat, followed Raya in a white car.  As Lewis and Booker pulled up next to Raya, Raya told Lott to duck down.  As she ducked, Lott saw a hand emerge from the front passenger window of the white car and heard five shots fired at their car.  (*Ibid.*)  (Other evidence indicated that Booker fired as few as three and as many as seven shots.) (*Id.* at p. 500, fn. 12.)  Raya was hit and died as a result of multiple gunshot wounds to his head.  (*Id.* at pp. 488–489.) Booker and Lewis were convicted of the murder of Raya and the attempted murder of Lott.  (*Id.* at p. 487.)  With respect to the attempted murder count, the court had instructed the jury on the kill zone theory.  (*Id.* at p. 496.)

Division Seven of this court reversed the attempted murder conviction.  After an extensive discussion of the development

16

of the Supreme Court's kill zone jurisprudence, culminating in *Canizales*, the court explained: "[T]he type and extent of force used do not support a reasonable inference Booker and Lewis intended to kill Raya by killing everyone in the car's cabin. At most, the evidence supports a reasonable inference [that] Booker and Lewis acted with conscious disregard of the risk Lott might be seriously injured or killed. . . . Booker as sole shooter fired a total of three to seven shots directed at the front driver's side of Lott's stationary car. Further, Booker's shots were directed at Raya at close range, striking him twice in his head and once in his arm in a manner consistent with Raya defensively raising his left arm during the shooting. The driver's side front window of Lott's car was shattered, but there were no bullet holes in the car's body or doors that would have reflected a spray of bullets. Nor was there evidence any bullets reached the front passenger side of the car where Lott was sitting, and Lott was not injured. . . . And finally, there was no evidence suggesting Booker used a rapid-firing semiautomatic or automatic weapon." (*Booker*, *supra*, 58 Cal.App.5th at p. 500, fn. omitted.)

Turning to the instant case, there was insufficient evidence to support a kill zone instruction with respect to count 2—the alleged attempted murder of Jesus A. The evidence was undisputed that the Pathfinder pulled up alongside the SUV driven by Sahagun. Jesus A. was in the front passenger seat of Sahagun's vehicle. Gomez got out of the Pathfinder, approached the driver's side of Sahagun's SUV and fired one to three shots at Sahagun from less than one foot away. The Attorney General concedes, this evidence demonstrates that "Gomez specifically targeted Sahagun." There was no evidence of a "spray of bullets" within Sahagun's vehicle or other evidence from which a jury

17

could reasonably infer that Gomez intended to kill Jesus A. or anyone else in the vehicle as a means of ensuring Sahagun's death. There was, therefore, insufficient evidence to support a finding that Gomez intended to kill Jesus A. under a kill zone theory.

We reach the same conclusion with respect to count 8 (the attempted murder of Robert G.) and count 14 (the attempted murder of Maria G.). These alleged victims were the passengers in cars driven by Leslie G. and Benjamin G., respectively. The Attorney General concedes that the drivers—the persons closest to Lazo's gun—were the specific targets in both cases. In neither instance is there substantial evidence that Lazo "intended to create a zone of fatal harm—that is, an area in which [he] intended to kill everyone present to ensure the primary target's death—around the primary target." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) There is no evidence that a bullet entered the cabin of Leslie G. and Robert G.'s car and the only bullet that entered Benjamin G. and Maria G.'s car hit Benjamin G. Although the distances between Lazo's gun and his targeted victims were farther than the distance between the shooter and target in *Booker*, the slightly greater distances are not enough to compel a different result. As in *Booker*, "[a]t most, the evidence supports a reasonable inference [that the shooter] acted with conscious disregard of the risk [that the passengers] might be seriously injured or killed." (*Booker*, *supra*, 58 Cal.App.5th at p. 500.) Subjecting the passengers to such "lethal risk," however, is insufficient to support the application of the kill zone theory. (*Canizales, supra*, 7 Cal.5th at p. 607; accord, *Cardenas*, *supra*, 53 Cal.App.5th at p. 116.)

18

The Attorney General argues that "[f]iring more than enough bullets to kill the driver and passenger at close range meets the definition of creating a kill zone." No authority is cited for this statement and, as *Booker* demonstrates, it is incorrect. Although the shooter in *Booker* fired as many as seven shots at the driver sitting next to a front seat passenger, the evidence was insufficient to support a kill zone instruction. Here, the additional shots Gomez and Lazo fired undoubtedly endangered others in the cars driven by Sahagun, Benjamin G., and Leslie G., but such endangerment, without more, "is insufficient to support a kill zone instruction." (*Canizales, supra*, 7 Cal.5th at p. 608.)

Because we conclude that the convictions on counts 2, 8, and 14 must be reversed for insufficient evidence under our high court's kill zone authorities, we need not consider Lazo's challenges to the kill zone instructions on those counts or to alleged misconduct by the prosecutor in arguing the kill zone theory to the jury.

## B. *Gang Expert's Evidence of Predicate Offenses*

Lazo contends that the gang enhancements and gang-related firearm enhancements must be reversed because the gang expert's evidence of predicate offenses was based on inadmissible hearsay. Although we agree with Lazo's claim of error, we conclude that the error was harmless with respect to all but one of the gang enhancement findings.

To prove a gang enhancement allegation under section 186.22, subdivision (b), the prosecution is required to prove that members of a relevant gang engage in, or have engaged in, a "pattern of criminal gang activity." (§ 186.22, subd. (f).) That phrase is defined in part as the commission or attempted commission of "two or more" enumerated offenses,

19

commonly referred to as predicate offenses. (*Id.,* subd. (e); *Valencia, supra,* 11 Cal.5th at p. 826.) The enumerated offenses include murder and carjacking. (§ 186.22, subd. (e)(3) & (21).)

The required two or more predicate offenses must be "committed on separate occasions, or by two or more persons" (§ 186.22, subd. (e)) and prior to or contemporaneous with the charged offense (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458 (*Duran*)). This requirement can be satisfied with "evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member" (*People v. Loeun* (1997) 17 Cal.4th 1, 10 (*Loeun*)) other than aiding and abetting the charged offense (*People v. Zermeno* (1999) 21 Cal.4th 927, 932 (*Zermeno*)).

In *Valencia,* a case decided after the trial in this case, the prosecution sought to prove the predicate offense requirement by introducing certified copies of court documents related to convictions of three ostensible gang members and the testimony of a gang expert concerning the facts of the offenses. (*Valencia, supra,* 11 Cal.5th at p. 827.) The gang expert, however, had no personal knowledge of such facts; his knowledge "came from conversations with other officers and a review of police reports." (*Ibid.*)

The *Valencia* court discussed a distinction the court had drawn in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), between gang expert testimony concerning background information and testimony regarding "case-specific facts." (*Valencia, supra,* 11 Cal.5th at pp. 830−831.) Background information includes facts that "are generally accepted by experts in their field of expertise" and "will usually be applicable to all similar cases." (*Id.* at p. 836; see also *id.* at p. 837, fn. 15

20

[" 'general background information' refers to expert knowledge derived from hearsay that is generally accepted as accurate by experts in the field"].)  Experts may testify to such information, notwithstanding its hearsay derivation, the court explained, because "[a] level of reliability is provided when an expert lays foundation as to facts grounded in his or her expertise and generally accepted in that field."  (*Id.* at p. 836.)

By contrast, the court in *Sanchez* explained, " '[c]ase-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried.' "  (*Valencia, supra,* 11 Cal.5th at p. 831, quoting *Sanchez, supra,* 63 Cal.4th at p. 676.)  " 'If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay.  Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception.' "  (*Valencia, supra,* 11 Cal.5th at p. 833, quoting *Sanchez, supra,* 63 Cal.4th at p. 684.)

The *Valencia* court "acknowledge[d] that the statutorily required predicate offenses do not fit neatly into the description [of case-specific facts] *Sanchez* provided" because the predicate offenses will "have occurred before 'the case being tried.' "  (*Valencia, supra,* 11 Cal.5th at p. 839.)  The court concluded, however, "that facts concerning particular events and participants alleged to have been involved in predicate offenses, too, constitute case-specific facts that must be proved by independently admissible evidence."  (*Ibid.*)  Proof of such facts, therefore, "may not be established solely by the testimony of an expert who has no personal knowledge of [such] facts."  (*Id.* at p. 826.)

21

Applying this rule to the case before it, the Supreme Court explained that the gang expert's testimony concerning the proffered predicate offenses was inadmissible hearsay and the contents of police reports, which the expert relied on, constituted testimonial hearsay for purposes of the Sixth Amendment's confrontation clause. (*Valencia, supra,* 11 Cal.5th at pp. 839–840.) Under the applicable *Chapman*[8] standard for prejudice, the court concluded, the error was not harmless and required reversal. (*Id.* at p. 840.)[9]

Applying *Valencia*'s holding here, Deputy Sarti's testimony regarding the predicate offenses committed by Jose Antonio Garcia and Richard Arredondo included inadmissible hearsay.[10]

---

[8] *Chapman v. California* (1967) 386 U.S. 18.

[9] The Supreme Court decided *Valencia* on July 1, 2021. Although the Attorney General filed his respondent's brief five weeks later, he does not mention the case.

[10] Although Lazo's counsel did not object to Deputy Sarti's testimony regarding the predicate offenses, we do not deem the argument forfeited. *Valencia* had not been decided at the time of Lazo's trial and the weight of appellate authority supported the prosecution's use of expert testimony to prove the predicate offenses. (See, e.g., *People v. Bermudez* (2020) 45 Cal.App.5th 358, 376, disapproved in *Valencia, supra,* 11 Cal.5th at p. 839, fn. 17; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411, disapproved in *Valencia, supra,* 11 Cal.5th at p. 839, fn. 17; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1174–1175, disapproved in *Valencia, supra,* 11 Cal.5th at p. 839, fn. 17.) A "defendant need not predict subsequent substantive changes in law in order to preserve objections." (*People v. Perez* (2020) 9 Cal.5th 1, 10.) Moreover, because the issue implicates Lazo's substantial rights, we exercise our discretion to review the issue.

Although the court minute orders the prosecution introduced into evidence may be admissible to prove the fact of the convictions of Garcia and Arredondo reflected in the orders (see *People v. Thompkins* (2020) 50 Cal.App.5th 365, 412−413; Evid. Code, § 452.5, subd. (b)), they do not reflect Garcia's or Arredondo's gang membership. (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 171−172 ["the use of a record of a prior conviction to prove any fact other than the fact of conviction violates the Sixth Amendment"].) Such facts are "case-specific facts that must be proved by independently admissible evidence." (*Valencia*, *supra*, 11 Cal.5th at p. 839.) Deputy Sarti's testimony that Garcia and Arredondo were Southside Whittier gang members was not based on his personal knowledge, but rather on inadmissible hearsay from field identification cards and arrest cards prepared by others. Under *Valencia*, therefore, the evidence was improper.[11]

If the only evidence of predicate offenses was Deputy Sarti's testimony regarding Garcia and Arredondo, *Valencia* would require reversal of the gang enhancements. Under

---

(See § 1259; *In re Sheena K.* (2007) 40 Cal.4th 875, 887−888, fn. 7; *People v. Williams* (1998) 17 Cal.4th 148, 161−162, fn. 6.)

[11] Deputy Sarti also referred to pictures of tattoos on Garcia and Arredondo, which he stated depicted their "gang affiliation." Gang tattoos are not hearsay. (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248.) Deputy Sarti, however, did not describe the tattoos or testify that they evidenced membership in Southside Whittier. His testimony about the tattoos, therefore, does not constitute substantial evidence of Garcia's or Arredondo's membership in the Southside Whittier gang.

*Watson*,[12] we will reverse if it is reasonably probable that the defendant would have obtained a more favorable result in the absence of the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Here, if Deputy Sarti's opinions that Garcia and Arredondo were Southside Whittier gang members were properly excluded, there would have been no evidence of their gang membership; and without such evidence, the prosecution would have failed to establish that the crimes committed by Garcia and Arredondo are predicate offenses for purposes of the gang enhancement.

The Attorney General, however, asserts that any error in allowing Deputy Sarti to testify as to the predicate offenses committed by Garcia and Arredondo is harmless because the prosecution also relied on the charged crimes committed by Lazo and the contemporaneous crimes that Gomez committed. Indeed, with respect to the predicate offense issue, the prosecutor argued to the jury: "The current crime itself . . . can [be used to show] a pattern of criminal activity as a predicate. Or I can bring in other evidence that there [were] other crimes committed by Southside Whittier. So what do we have? In this case we have two defendants, two suspects at least, Reyna Gomez and this defendant here, Alejandro Lazo, committing the crimes of murder, attempted murder, [and] carjacking . . . . So we have that evidence here. I've also provided you with those two court minute orders . . . . One of them was [regarding] a Southside gang member by the name of Richard Arredondo and the other was a Southside Jose Garcia."

The Attorney General's argument has merit. As noted above, the predicate offense requirement can be satisfied with

---

[12] *People v. Watson* (1956) 46 Cal.2d 818.

24

"evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member." (*Loeun, supra,* 17 Cal.4th at p. 10.) In contrast to Deputy Sarti's inadmissible opinions of Garcia's and Arredondo's gang membership, Deputy Maldonado's testimony regarding her personal interactions with Lazo and Gomez at Mayberry Park in April 2017, when they admitted to her that they are Southside Whittier gang members, is admissible and sufficient evidence to establish that Lazo and Gomez are such gang members.

Because Lazo and Gomez are fellow Southside Whittier gang members, Lazo's crime of attempting to murder Michael L., for example, constitutes a predicate offense for purposes of that charged offense; and, if Gomez attempted to murder Tommy A. 11 minutes earlier, her crime constitutes a second predicate offense. A similar correlation of charged offenses committed by Lazo with a prior offense committed by fellow gang member Gomez can be established for each of the charged crimes except the first—the carjacking of the Pathfinder. The evidence of the carjacking establishes that Lazo, who pointed a gun at Johnny G. and demanded that he get out of the Pathfinder, was the direct perpetrator and Gomez, who stood at the passenger side of the Pathfinder and entered the Pathfinder with Lazo, aided and abetted Lazo in that crime. Because our Supreme Court has held that aiding and abetting a crime does not constitute a second predicate offense with respect to a crime perpetrated directly by the defendant (*Zermeno, supra,* 21 Cal.4th at p. 932), Gomez's apparent aiding and abetting of the carjacking cannot satisfy the predicate offense requirement in proving the gang enhancement connected to Lazo's carjacking offense. Nor can the Attorney

General rely on Gomez's criminal conduct after the carjacking as a predicate offense with respect to the carjacking count. (See *Duran, supra,* 97 Cal.App.4th at p. 1458; *People v. Godinez* (1993) 17 Cal.App.4th 1363, 1365.)

It follows from the foregoing that the jury's true findings of the gang enhancement allegations must be reversed if the findings are based on the inadmissible evidence introduced through Deputy Sarti regarding the predicate offenses that Garcia and Arredondo committed, but (with the exception of the finding connected to the carjacking count) affirmed if the findings are based on the evidence of Lazo's and Gomez's criminal conduct.

As noted above, the prosecutor expressly argued both factual theories to the jury. If the problem with the jury's possible reliance on Deputy Sarti's evidence concerning Garcia and Arredondo was that such evidence was insufficient to establish the predicate offenses, we would presume that the jury relied on the factually adequate alternative ground and affirm the enhancement findings (with the exception of the enhancement as to the carjacking conviction). (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Here, however, where one of the factual theories of predicate offenses is defective because it is based on inadmissible evidence, our Supreme Court has explained that the error is prejudicial if the "reviewing court is unable to determine from the record whether a jury convicted on admissible evidence or rejected that evidence and convicted on inadmissible evidence improperly received." (*People v. Robinson* (1964) 61 Cal.2d 373, 406; accord, *People v. Green* (1980) 27 Cal.3d 1, 69.) If, however, "on the record it appears beyond a reasonable doubt that the jury based its verdict on the theory

26

supported by 'admissible evidence submitted under correct instructions[,]' . . . there is no miscarriage of justice and the judgment must be affirmed. (*People v. Cantrell* (1973) 8 Cal.3d 672, 686; see *People v. Aledamat* (2019) 8 Cal.5th 1, 13 [applying *Chapman*'s beyond a reasonable doubt harmless error standard in cases of "alternative-theory error"].)

Here, as to each of the charged offenses, the jury's verdicts necessarily establish that one Southside Whittier gang member— namely, Lazo—committed a predicate offense prior to, or contemporaneous with, the charged offenses. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 625; *Loeun, supra,* 17 Cal.4th at p. 4.) More specifically, the jury's verdict that Lazo committed carjacking—one of the crimes enumerated in section 186.22, subdivision (e)—constitutes a predicate offense as to the carjacking offense as well as to the subsequent murder and attempted murders of which he was convicted. The verdicts thus establish beyond a reasonable doubt that the jury found that Lazo himself committed offenses that constitute predicate offenses under the gang enhancement statute.

We must still be convinced beyond a reasonable doubt that the jury found that Gomez had committed a predicate offense prior to or contemporaneously with Lazo's crimes. (§ 186.22, subd. (e).) Although the jury did not render verdicts or make express findings that Gomez committed crimes in this case, the verdicts it rendered against Lazo and the evidence in this case lead us to conclude beyond a reasonable doubt that the jury determined that Gomez, a Southside Whittier gang member, attempted to murder Tommy A. The evidence was undisputed that Lazo drove the carjacked Pathfinder up to Tommy A., handed a gun to Gomez, and told Gomez to "shoot him." Gomez

fired at Tommy A. and hit him in his groin area. She then raised the gun, aimed it at Tommy A.'s head, and pulled the trigger. The gun, however, jammed and Tommy A. was able to escape. Based on this evidence, the jury found Lazo guilty of attempted murder on a theory that he aided and abetted the perpetrator: Gomez. Even if that verdict alone does not necessarily imply that Gomez had the requisite mental state necessary to be guilty of attempted murder (see *People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [an aider and abettor's guilt may be greater than the actual perpetrator's]), when the verdict is viewed in light of the evidence, the inference of her guilt is so compelling as to allow no reasonable doubt that the jury found that Gomez had committed that crime for purposes of establishing a second predicate offense by a Southside Whittier gang member.

The error in allowing Deputy Sarti's opinion testimony regarding the gang membership of Garcia and Arredondo and of presenting to the jury a theory of predicate offenses based on such evidence is therefore harmless, except, as explained above, with respect to the enhancement associated with the carjacking conviction. Because there was no lawful basis upon which the jury could have found two predicate offenses associated with the carjacking count, the gang enhancement for that count must be reversed.

### C.    *Sufficiency of the Evidence to Support the Gang Enhancements*

Lazo further argues that the evidence was insufficient to support the finding that he committed his crimes "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b).) We reject the argument.

28

Whether a crime is committed in association with a gang can be established by expert testimony (*People v. Albillar* (2010) 51 Cal.4th 47, 63), provided it is not "purely conclusory" (*People v. Prunty* (2015) 62 Cal.4th 59, 85). Here, Deputy Sarti testified that gang members will work with other gang members because they can trust each other. "They would rather take someone within their gang that they trust and they know are going to be loyal to them in case they get caught." Committing crimes with another trusted gang member, Deputy Sarti testified, increases the likelihood that they will complete the crime without getting caught. Gang members will also commit crimes with one another so that each has someone that can confirm that he or she committed the crimes, which can enhance the individual's standing within the gang. In response to a hypothetical question that mirrored the facts of this case, including the fact that two gang members committed the crimes together, Deputy Sarti opined that the hypothetical criminals were acting in association with a gang because "there's two individuals from the same gang working together to commit these crimes."

In addition to Deputy Sarti's testimony, there is evidence that Lazo's and Gomez's crime spree began as a broader Southside Whittier gang-related enterprise. The carjacking that provided the vehicle for committing the shootings involved not only Lazo and Gomez, but at least two others who were together with Lazo and Gomez in the white car that pulled up behind the Pathfinder. As Lazo and Gomez drove away in the Pathfinder, two men got out of the white car and told Johnny G. words to the effect of, "this is South Side." Jurors could easily infer from that statement that the carjacking was gang-related and reasonably

29

infer that the shooting spree that followed soon afterward was connected with the carjacking and similarly gang-related.

Based on the foregoing, the evidence was sufficient to support findings that Lazo committed the crimes in association with a criminal street gang.

### D.     *Exhibit 49—Minute Order re Lazo's Prior Offense*

The prosecution introduced exhibit 49 while questioning Deputy Sarti about predicate offenses. The first three pages of the exhibit are minute orders issued in the case of *People v. Jose Antonio Garcia* (L.A. Sup. Ct. case No. VA141398). As discussed above, the minute orders reflect the conviction of Garcia of the crime of being a felon in possession of a firearm. Following the first three pages are five pages of court minute orders in the case of *People v. Alejandro Lazo* (L.A. Sup. Ct. case No. VA139882), presumably the defendant in this case. These pages, appear to reflect Lazo's conviction by plea in February 2016 of violating section 245, subdivision (a)(1) and section 520.[13] The document also states that the court sentenced Lazo to three years in prison on each count, with the sentence on the second count to run concurrently with the first.

---

[13] The minute order does not indicate the substance of section 245, subdivision (a) or section 520. Section 520, at the relevant time, prescribed the punishment for extortion of "any money or other property from another, under circumstances not amounting to robbery or carjacking, by means of force, or any threat." (Former § 520.) Section 245, subdivision (a)(1) criminalizes assault with a deadly weapon other than a firearm.

Lazo contends that the inclusion of the five pages referring to his prior conviction constitutes prosecutorial misconduct and deprived him of his right to a fair trial.

Lazo has forfeited any argument concerning the admission of the extraneous pages in exhibit 49 by failing to object to them below. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 976; *People v. Valdez* (2004) 32 Cal.4th 73, 124−125.) As the Attorney General points out, the inclusion of the pages referring to Lazo could have been avoided if counsel had raised the issue any time prior to the commencement of jury deliberations. Lazo did not, however, raise any objection to the document or otherwise bring the issue to the court's attention in any way.

In any event, the inclusion of the extra pages, which the Attorney General describes as a "careless mistake," does not constitute a "deceptive or reprehensible" prosecutorial method (see *People v. Hill* (1998) 17 Cal.4th 800, 819) and did not deprive Lazo of a fair trial. Nor is there any basis for concluding that the exhibit was prejudicial under any standard. The only reference to exhibit 49 during trial occurred when the prosecutor drew Deputy Sarti's attention to "just the top page" of the exhibit, and asked the deputy if it indicated that Jose Antonio Garcia committed the crime of being a "felon with a firearm." Deputy Sarti said it did. Neither side thereafter referred to the exhibit or mentioned it during closing arguments. The jury did not ask any question about the document. Indeed, there is no reason to believe that the jury, if it looked at the document at all, looked beyond the "top page"—the only page that the prosecutor indicated was relevant. Even if a juror did notice the additional pages attached to the Garcia minute orders, there is no reason to believe that the information had any effect on the jury's verdict.

31

Lazo further contends that his counsel was constitutionally deficient by failing to examine exhibit 49 and object to the offending pages of the exhibit. Even if we assume that counsel acted below the standard of care by failing to inspect the exhibit or object to it, Lazo has made no showing that these deficiencies in counsel's performance were prejudicial under *Strickland v. Washington* (1984) 466 U.S. 668.

### E.  *Exhibit 48—Notation of Parole on Field Identification Cards*

The prosecution introduced the two field identification cards concerning Lazo as evidence that Lazo had admitted to Deputy Maldonado to being a member of the Southside Whittier gang. On the back side of the cards, there is a box that is checked in front of the word, "parole." Lazo contends that his status as a parolee was irrelevant and unduly prejudicial under Evidence Code section 352, and that the reference to "parole" should have been redacted.

The argument is forfeited by failing to raise it below. In any case, the prosecutor's failure to redact the reference to parole does not constitute misconduct. The prosecutor did not refer to the offending statement or question any witness about it, and there is no basis in the record for concluding that it came to the attention of any juror or, if it did, that it had a prejudicial effect on the verdict. For the same reason, Lazo's argument that he was deprived of the effective assistance of counsel because his counsel failed to object to the reference is without merit.

### F. *Prosecutor Comments on Ballistics Expert Testimony*

Lazo contends that the prosecutor committed prejudicial misconduct by vouching for the credibility of the ballistics evidence. There was no error.

A criminalist and ballistics expert testified to her opinion that the gun found next to Lazo in the white Kia fired bullets connected to cartridges found in the Pathfinder and a bullet taken from Sahagun's body. The expert explained how she compared the marks on the bullet cartridges found in the Pathfinder and on the bullet taken from Sahagun's body with marks on bullets and bullet cartridges created when she test-fired Lazo's gun.

After her testimony, the court permitted a juror to submit a question to the ballistics expert asking: What is the probability that markings on the bullets and cartridges could match both the tested gun and another gun? The expert answered: "This is not a field like DNA in which there is [*sic*] genetic populations or probability that can be stated at this point. There is research being conducted to better answer that question," including the development of "software and . . . algorithms with computers and technology to supplement the examiner's opinion and develop some better statistics around the field, but today there is no number that I can give. It's not analogous to DNA." On cross-examination regarding the question, the expert stated that, "as an examiner[,] what I'm looking for is a certain quantity and quality of marks that have duplicated, that have reproduced, not 100 percent."

During closing argument, the prosecutor addressed the juror's question and the expert's response. He acknowledged

that the expert stated that "there's no statistical analysis for [ballistics testing]," and added: "The alternative is this. The alternative is that this defendant here is seen in that car, in that green Pathfinder, his DNA is found in that green Pathfinder. His DNA is found in the Kia. He is found with a gun that has his DNA in the magazine of that gun. He's got that gun in his hip pocket. The alternative to this gun being the same gun used by this defendant to shoot Tommy [A.], the alternative is that somebody else on that particular Saturday, on April 29th of 2017, another male Hispanic, female Hispanic got a green Pathfinder, went to all these various locations, shot all these people and somehow the gun that they had . . . leaves the exact same ballistic imprints that's found on the gun that this defendant had that night. That is—I'm just going to say it. That is impossible. Okay? Because that's the alternative. Because all the evidence points to this defendant being the shooter, this defendant being the driver, this defendant having the gun. And to say that there's a possible other gun that might have been used in those series of facts, it's just not possible." Lazo did not object to these statements.

During his rebuttal argument, the prosecutor reiterated his point: "[T]he alternative [to the argument that Lazo's gun is the gun used in the subject shootings] is somebody else has the exact same firearm in the exact same car, a green Pathfinder, a white Kia, and they went on the same exact rampage that they did[,] and it just so happens that the two guns that shoot exactly alike and leave the exact same defects, one of them falls into [Lazo's] hip pocket. And that is unreasonable. That is impossible." Again, Lazo did not object.

34

On appeal, Lazo contends that the prosecutor's comments amounted to "unsworn testimony without being subject to cross-examination" and created "a significant danger the jurors would misunderstand the prosecutor's comments to mean they were not required to independently assess the ballistics expert's testimony."

Lazo forfeited this argument by failing to object to the prosecutor's statements. Even if the argument has been preserved, it is without merit. We agree with the Attorney General that the prosecutor's comments did not constitute improper vouching for the ballistics expert or were otherwise outside the "wide latitude" that prosecutors are given during argument. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336–337; see *People v. Frye* (1998) 18 Cal.4th 894, 971 [prosecutor does not commit improper vouching when his comments about a witness's testimony "are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief' "].)

### G. *Alleged Vouching for Deputy Sarti*

Lazo argues that the prosecutor committed misconduct by improperly vouching for Deputy Sarti during the prosecutor's rebuttal argument. Even if the argument was not forfeited by Lazo's failure to object during trial, he has failed to establish prejudicial error.

During cross-examination of Deputy Sarti, defense counsel asked how often Deputy Sarti, in testifying as a gang expert, concluded that the crimes described in a prosecutor's hypothetical were committed for the benefit of or in association with a gang. Deputy Sarti answered, "[p]robably 80 or 90 percent" of the time.

During the defense closing argument, counsel argued that Deputy Sarti is "given a hypothetical that exactly mirrors this case, and then he is asked[,] is this done for the benefit of, direction, or in association with a criminal street gang?  He says yes.  Of course."

During the prosecutor's rebuttal argument, the prosecutor addressed Deputy Sarti's testimony that he opines favorably for the prosecution 80 or 90 percent of the time.  Counsel argued: "But what he also testified is this.  Look, in the other [10] to 20 percent of the time I don't see it.  I don't see it.  I don't see the relationship between gangs and a crime and I don't think it's done for the benefit of a gang.  And what he told you is this.  If a D.A. asks me to do it, I tell them no.  If a D.A. asked me to do it, I would get up on the stand and I would say no.  There's no reason for him to put his career on the line and get up here and just simply rubber stamp anything that the prosecution is asking him to say."  Lazo asserts that this last sentence, which he quotes in isolation, constitutes improper vouching for Deputy Sarti.

Lazo did not object to the statement below and his challenge on appeal is therefore forfeited.  Even if the argument is not forfeited, the challenged statement is within the " 'wide latitude' " counsel is given to fairly comment on the evidence. (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)

## H.  *Alleged Misconduct During Prosecutor's Re-argument on Count 1*

After two days of deliberations, the jury informed the court that it had "agreed on all the counts but one."  The remaining count was count 1, the murder of Sahagun.  The court read the verdicts on the counts the jury had reached, which included the findings that the attempted murders were committed willfully,

36

deliberately, and with premeditation.  Upon inquiry from the court, the jury asked for clarification regarding aiding and abetting liability (to which the court referred them to jury instructions on the point) and requested re-argument with respect to "the criteria for first degree murder as it applies to this case."

Lazo contends that the prosecutor committed misconduct during the re-argument by lowering the prosecutor's burden of proof, misstating the evidence, and misstating the law.  These arguments have been forfeited by failing to raise the issue below.  Even if not forfeited, we would reject them on the merits as we explain below.

The prosecutor argued that in determining whether Lazo committed first degree murder of Sahagun, "you [the jurors] have to look at the totality of what happened [that] day," not at the shooting of Sahagun in "isolation alone."  The prosecutor proceeded to recount the shooting of Tommy A., where Lazo "hands the gun to [Gomez] and tells her to shoot him."  The prosecutor further described the other attempted murders, which the jurors had previously found were committed with premeditation, willfulness, and deliberation.  The prosecutor then argued:  "You all found that each of those individuals in the car that were lined up in front of him he had the premeditation, the willfulness and deliberation to kill each of those as well.  So it's unlikely—in fact, I'd say it's unreasonable for him to have that premeditation and willfulness and deliberation to kill Tommy [A.], Michael [L.], Benjamin [G.], Maria [G.], Anthony [E.] and then get to the Sahagun family and not have that specific intent to kill him, and then when he gets the gun back and goes on his shooting spree again attempt[s] to kill Lisa [R.],

37

William [K.], Leticia [A.], Julio [R.]—you found that he had the premeditation, willfulness and deliberation in the attempted murders of the people preceding Mr. Sahagun and after Mr. Sahagun. And to believe that when it came to Mr. Sahagun he did not have the premeditation and willfulness and deliberation, I think that goes counter to the evidence. So based on the facts that we have here of that intent that he had to kill from the very beginning of . . . Tommy [A.] all the way to the end of . . . William [K.], he had that same premeditation and willfulness and deliberation to kill along the way when it came to Mr. Sahagun as well."

Lazo contends that the prosecutor's argument "improperly bootstrapped the unresolved murder charge to the multiple guilty verdicts already rendered" and that the effect of the argument "was to remove the elements of the murder charge from the jury's consideration and to lower the prosecution's burden of proving all elements of the murder charge beyond a reasonable doubt." We disagree. The prosecutor argued, in essence, that the jury can infer from the fact that Lazo acted with willfulness, premeditation, and deliberation in the commission of the attempted murders that took place before and after the shooting of Sahagun that he acted with the same mental state when he aided and abetted Gomez in the shooting of Sahagun. The statements did not lessen the burden of proof and do not constitute misconduct.

Lazo further contends that the prosecutor committed misconduct by misstating the evidence when he argued that Lazo handed the gun to Gomez prior to Gomez "exiting the vehicle" just before she shot Sahagun. We reject the argument. The prosecutor argued that, after Gomez shot Tommy A., Lazo

38

had possession of the gun during the attempted murders of Michael L., Benjamin G., and Anthony E. prior to reaching the intersection of Santa Gertrudes and Alicante. The prosecutor then stated that Lazo "gives that gun to . . . Gomez just like he did with [the shooting of] . . . Tommy [A.] . . . [¶] . . . He had to turn that gun over to . . . Gomez because he's used it immediately before. He knows what . . . Gomez is capable of. He has told her what to do. He has seen her do it. And he hands that gun over to her when they pull up to the Sahaguns."

The assertion that Lazo handed the gun to Gomez during the short time between his attempted murders of Michael L., Benjamin G., and Anthony E.—all of which took place within minutes of Gomez's shooting of Sahagun—is a reasonable inference, particularly in light of his handing of the gun to Gomez for the purpose of shooting Tommy A. about one-half hour earlier. The comment is not misconduct.

Lazo next argues that the prosecutor misstated the law when he stated: "The premeditation, willfulness and deliberation, it doesn't matter what the female did. It doesn't matter if . . . Gomez had other thoughts in her head. The fact that . . . Lazo . . . had that premeditation and willfulness and deliberation, that intent when he turned that gun over and she ended up shooting and killing him, that makes him liable for first degree murder." Lazo argues that this is incorrect because aiding and abetting the crime of murder requires the defendant to " 'know and share the murderous intent of the actual perpetrator.' (*People v. McCoy*[, *supra*,] 25 Cal.4th [at p.] 1118.)"

Contrary to Lazo's suggestion, the jury could have convicted Lazo of first degree murder by aiding and abetting Gomez even if "Gomez had other thoughts in her head" and did

not premeditate or deliberate the murder herself.  (See *People v. McCoy*, *supra*, 25 Cal.4th at p. 1122 ["[A] person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea.  If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator."].)

Because we conclude the prosecutor's challenged comments did not constitute misconduct, Lazo's related arguments that his counsel was ineffective by failing to object to the comments necessarily fails.

## DISPOSITION

The attempted murder convictions on counts 2, 8, and 14 are reversed based on insufficiency of the evidence.  The true finding on the gang enhancement allegation under Penal Code section 186.22, subdivision (b) as to the conviction on count 12 is reversed.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


BENDIX, J.


41